(56 P.3d 290)
No. 86,968

STATE OF KANSAS, *Appellee,* v. RASHEEM A. COLEMAN, *Appellant.*

Opinion filed August 30, 2002.

*Patrick Dunn* and *Craig Durham,* assistant appellate defenders, and *Steven R. Zinn,* deputy appellate defender, for appellant.

*Boyd K. Isherwood,* assistant district attorney, *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, for appellee.

Before JOHNSON, P.J., LEWIS, J., and JONES, S.J.

JOHNSON, J.: Following a jury trial, Rasheem A. Coleman was convicted of attempted premeditated first-degree murder and ag-

gravated robbery; he was sentenced to a controlling term of 346 months' imprisonment. He timely appealed his conviction and sentence, alleging the district court erred by: (1) refusing to exclude his statements to law enforcement; (2) failing to give certain jury instructions; and (3) allowing the inclusion of juvenile adjudications in his criminal history score. We reverse and remand for a new trial.

The charges in this case arose from the robbery of a store in Wichita called Gold and Diamond Traders. Two men, later identified as Aaron "Spud" Douglas and Mario "Ocho" Merrills, entered the store and demanded money and jewelry. The robbers took approximately $450 cash and various items of jewelry. During the course of the robbery, Merrills shot the owner of the store in the chest.

Coleman's involvement in the robbery was as an aider and abettor. Douglas and Merrills discussed the robbery with Coleman beforehand; Coleman knew the owner of the store and had been a customer. Indeed, Coleman alerted Douglas and Merrills to the fact that the owner of the store had a gun on the premises. Merrills then made the statement that if the owner pulled a weapon on him, it would be " 'the last mistake he makes.' "

Coleman and his girlfriend, Tiffany Mayson, drove Douglas and Merrills to the store and waited outside while the robbery unfolded. The group had walkie-talkies to communicate: One was in the car with Coleman and Mayson, and the other was in the store with Douglas and Merrills. Presumably in exchange for his involvement in the robbery, Coleman received 7 to 10 of the rings which were taken from the store.

Coleman was eventually taken into custody, charged with aggravated robbery and attempted first-degree murder, arraigned, and appointed counsel. Mayson, who had apparently not been charged with any offense, repeatedly attempted to contact Deputy District Attorney Kim Parker, who had filed the complaint in Coleman's case. Unbeknownst to Mayson, Coleman's case had been reassigned to Assistant District Attorney David Kaufman. Mayson's messages indicated she wanted to discuss possible plea arrange-

ments for Coleman. While Coleman had not asked Mayson to call Parker, he was aware of her activities.

Thinking it would be inappropriate to return Mayson's telephone calls, Parker asked the Wichita Police Department to tell Mayson to redirect her inquiries to Assistant District Attorney Kaufman. Two police detectives eventually spoke with Mayson's grandmother, who informed them that Mayson was "laying low." The detectives asked the grandmother to pass along the message that Mayson's questions should be addressed to Kaufman, not Parker. When the grandmother mentioned to the detectives that Coleman wanted to cooperate or make a deal, they informed her that Coleman had been appointed counsel and if Coleman wanted to talk, he had to contact them.

The grandmother's recollection of the conversation was somewhat different. According to her, the detectives told her that they thought Coleman was a good kid and did not have anything to do with the robbery. She also claimed that the detectives told her that they wanted Coleman to contact them so they could make a deal. She then relayed that message to Coleman.

Based on this information, Coleman contacted one of the detectives the following day. Coleman waived his *Miranda* rights and acknowledged, in writing, that he had initiated the contact with the police. In a taped statement, Coleman admitted his involvement in the robbery.

Defense counsel filed a motion to suppress the tape, arguing that the detectives improperly induced Coleman to contact them and confess. This argument was based on Mayson's grandmother's version of the events surrounding her conversation with the detectives. The trial court denied Coleman's motion, noting that the issue came down to the credibility of witnesses. The judge opined that Coleman was "obviously bright and intelligent" and that "he is not naive of [the] criminal justice system." However, the trial court found that the police did nothing improper during their conversation with Mayson's grandmother and that Coleman and Mayson solicited the police interview. The tape was admitted into evidence at trial over defense counsel's renewed objection.

Coleman was ultimately convicted of both aggravated robbery and attempted first-degree murder. At sentencing, the trial judge imposed the "high" presumptive sentence on both counts and ran the sentences consecutively. Coleman's criminal history score of C included prior juvenile adjudications.

*CONFESSION*

Coleman challenges the district court's denial of his motion to suppress his taped statements to the police. Specifically, Coleman argues that the police contact with Mayson's grandmother, who, in turn, contacted him, improperly induced him to waive his right to counsel and confess to the charged offenses.

Upon the hearing of a motion to suppress evidence, the State bears the burden of proof. When reviewing a trial court's decision as to the suppression of evidence, an appellate court normally gives great deference to the factual findings of the trial court. The ultimate determination of the suppression of evidence, however, is a legal question requiring independent appellate determination. See *Arizona v. Fulminante*, 499 U.S. 279, 285-87, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991); *State v. Vandiver*, 257 Kan. 53, 57-58, 891 P.2d 350 (1995).

A criminal defendant's right to counsel is rooted in both the Fifth and Sixth Amendments to the United States Constitution. The Fifth Amendment protection against self-incrimination provides the foundation for the right to counsel during custodial interrogations. *Edwards v. Arizona*, 451 U.S. 477, 481-82, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *Miranda v. Arizona*, 384 U.S. 436, 470, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Once a suspect has invoked his or her right to counsel during questioning, the police may not interrogate him or her unless the accused initiates further communications, exchanges, or conversations with the police. *Edwards*, 451 U.S. at 484-85. The Sixth Amendment provides the accused with the right of effective assistance of counsel and attaches at the initiation of adversary judicial proceedings. *United States v. Gouveia*, 467 U.S. 180, 187-88, 81 L. Ed. 2d 146, 104 S. Ct. 2292 (1984). If police initiate interrogation after a defendant's assertion of his or her right to counsel at an arraignment or similar

proceeding, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid. *Michigan v. Jackson*, 475 U.S. 625, 636, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986).

Coleman has alleged violations of his right to counsel under both the Fifth and Sixth Amendments, albeit he has collapsed these arguments in his brief. At the suppression hearing, the State argued that "[t]he real issue gone over by the Court on the October 28 questioning is whether or not Coleman's Sixth Amendment right to counsel was violated by law enforcement initiating contact with Coleman." In announcing its decision, the district court did not mention whether its decision was based on the Fifth or on the Sixth Amendment. In deference to the dissent's belief that we are usurping the fact-finding duties of the trial court, the trial judge's entire ruling is set forth below.

"Regarding the October 18 interview, I would actually like to thank both the lawyers. This is a very interesting issue, and when you do criminal for as long as I've been doing it, you don't seem to see many new or interesting issues. They all seem the same. This is extremely interesting. I want to—I agree with Mr. Kaufman that this does come down to the credibility of the witnesses. I want to make a couple of comments on this. Mr. Coleman testified, and I was kind of shocked when I saw his personal history sheet that he has a tenth grade education. Certainly that is not reflected in what I saw on the witness stand. Mr. Coleman is obviously bright and intelligent. He's well spoken. The answers that he gave here were thoughtful, and I actually thought that he probably had some college. He's very mature, and I was quite impressed with his level of intelligence that I observed.

"I also would point out that Mr. Coleman is somewhat sophisticated within the criminal history, within the criminal system. His personal history sheet and his own testimony indicate that he has had prior law enforcement contacts. And in fact, it appears he has actually been in prison after the conviction on an escape charge, it appears, as an adult, and a violation of probation to Community Corrections. He's also been to Labette boot camp. He has some juvenile—he has a juvenile record as well. So I would say that his contact with lawyers, defense lawyers, et cetera, has been somewhat significant for someone of his age, and I would point out that in my mind I believe that that indicates to me that he is not naive of the criminal justice system.

"It is very clear that this whole, this second—I'm calling this the second interview, this interview on October 18 was essentially initiated through the contacts that Tiffany Mayson and perhaps this aunt had with Ms. Parker. Ms. Parker indicated that she had numerous messages left on her answering machine. I'm not surprised that she is somewhat unfamiliar or we did catch her off guard, but she

did have definite memory of that. It is supported through Mr. Coleman's testimony and through the testimony of Ms. Mayson as well. Everyone was aware that Tiffany was—Tiffany Mayson was calling Kim Parker. Ms. Parker indicated that she did contact Detective Jacob. She was somewhat unclear. But given the fact that Detective Jacob testified and his testimony was supported by the testimony of Detective Nevil, that they went to that home to basically inform Ms. Mayson of the new attorney, of the different attorney, it is clear that this whole situation had its genesis in the actions of both Mr. Coleman and Tiffany.

"They went to that home not to solicit a statement from Mr. Coleman. I am convinced from the evidence that they went there solely in an investigative manner or whatever, but it was not to solicit a statement from Mr. Coleman. I am convinced from the evidence, clearly convinced from the evidence that they did nothing improper in their conversation with Ms. Mayson. I really don't know where to go—I don't think there is much more to say other than I find that Mr. Coleman on his own solicited the contact, initiated the contact with Detective Jacob, both on the day that he called, but all the events that led up to that were initiated by Mr. Coleman and by Tiffany Mayson. And I find that the statement is admissible in trial in this matter."

We proceed to analyze the events under both the Fifth Amendment and the Sixth Amendment.

## 1. Fifth Amendment Right to Counsel

Prior to a custodial interrogation, a suspect must be advised that he or she has the right to remain silent and the right to the presence of counsel. *Miranda*, 384 U.S. at 479; *State v. Matson*, 260 Kan. 366, 373, 921 P.2d 790 (1996). A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The definition of "interrogation" extends to "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *State v. Valdez*, 266 Kan. 774, 793, 977 P.2d 242 (1999) (citing *Rhode Island v. Innis*, 446 U.S. 291, 299-302, 64 L. Ed. 2d 297, 100 S. Ct. 1682 [1980]). If a suspect effectively waives his or her right to counsel after receiving *Miranda* warnings, law enforcement officers are free to question him or her. *North Carolina v. Butler*, 441 U.S. 369, 372-76, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979). However, if a suspect requests counsel at any time during the interview, he or she is not subject

to further questioning until a lawyer has been made available or the suspect reinitiates conversation. *Edwards*, 451 U.S. at 484-85.

There is no doubt that Coleman's interaction with the police was a custodial interrogation as contemplated by the Fifth Amendment and that he was entitled to have counsel present. The issue is whether Coleman's waiver of his *Miranda* rights was valid.

"[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019 [1938]).

Prior to questioning, Coleman executed a written waiver of his *Miranda* rights. At no time during the interview or during any police questioning did Coleman assert his right to counsel. An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he or she has previously retained counsel does not necessarily render inadmissible an otherwise voluntary statement made by the defendant in his or her counsel's absence. *State v. Pursley*, 238 Kan. 253, 263, 710 P.2d 1231 (1985).

Coleman does not appear to challenge the voluntariness of his confession. Therefore, we need not consider whether the waiver was induced by an unfulfilled promise of a favorable plea arrangement. Coleman's argument is that the district court should have suppressed his statement because the police conduct at issue constituted an improper initiation of contact. The problem with Coleman's argument is that he never asserted his right to counsel during any police questioning. Because Coleman never actually invoked his right to counsel during police questioning, the *Edwards* rule does not apply and his argument fails. See *Davis v. United States*, 512 U.S. 452, 458, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994); *State v. Bailey*, 256 Kan. 872, 882, 889 P.2d 738 (1995).

*2. Sixth Amendment Right to Counsel*

The analysis under the Sixth Amendment is somewhat different, although the basic rule is the same. The Sixth Amendment provides

for the assistance of counsel for an accused in all criminal prosecutions. Once this right has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective. *Jackson*, 475 U.S. at 636. Because of their differing sources, however, the Fifth Amendment and Sixth Amendment "no-contact" rules have been applied differently. See, *e.g.*, *McNeil v. Wisconsin*, 501 U.S. 171, 175, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991) (holding Sixth Amendment right to counsel, and therefore the effect of *Jackson*, is "offense specific"); *State v. Morris*, 255 Kan. 964, 976-79, 880 P.2d 1244 (1994).

Indeed, our courts have recognized the distinct purposes behind the right to counsel as provided in the Sixth Amendment, and that established by *Miranda, Edwards*, and the Fifth Amendment. The purpose of the Sixth Amendment guarantee of counsel is to " 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." *McNeil*, 501 U.S. at 177-78 (quoting *Gouveia*, 467 U.S. at 189). On the other hand, the purpose of the *Miranda-Edwards* guarantee is to protect a different interest: "the suspect's 'desire to deal with the police only through counsel.' " *McNeil*, 501 U.S. at 178 (quoting *Edwards*, 451 U.S. at 484).

*Jackson* implicitly rejected any equivalence between the invocation of the Sixth Amendment right to counsel and the expression of the desire to have counsel present during a custodial interview, as required by *Edwards*. In other words, the assertion of the Sixth Amendment right to counsel does not necessarily constitute the expression, as *Edwards* required, of a wish to have counsel present during a custodial interrogation. Thus, the relevant question in applying *Jackson* is not whether the *Miranda*/Fifth Amendment right had been asserted, but whether the Sixth Amendment right to counsel had been waived. *McNeil*, 501 U.S. at 179. Again, waiver of the right is valid only when it reflects " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Patterson v. Illinois*, 487 U.S. 285, 292, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988) (quoting *Johnson*, 304 U.S. at 464).

There is no dispute that Coleman's right to counsel under the Sixth Amendment had attached and had been asserted when he was appointed counsel. Compare *Patterson*, 487 U.S. at 290-93 (holding *Jackson* did not apply where accused had not invoked his Sixth Amendment right to counsel at indictment and was not represented by counsel at post-indictment questioning). Under *Jackson*, any waiver of his right to counsel during a subsequent police-initiated interview would be invalid; consequently, any statements made during such an interview should be suppressed.

The Sixth Amendment imposes on the State an affirmative duty to respect and preserve an accused's choice to seek the assistance of counsel. Specifically, police and prosecutors are obligated not to act in a manner that circumvents and dilutes the protection afforded by the right to counsel. *Maine v. Moulton*, 474 U.S. 159, 171, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985). The Sixth Amendment is not always violated when the State obtains incriminating evidence from the accused after the right to counsel has attached. "However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Moulton*, 474 U.S. at 176.

While the facts and issues in *Moulton* are admittedly different from those in the instant case, as the interrogation in that case was covert, the rationale behind that decision is still applicable here. In *Moulton*, the police enlisted the assistance of a codefendant to elicit and record incriminating statements from the defendant, after the defendant had retained counsel. The Court held that incriminating statements pertaining to pending charges are inadmissible at the trial of those charges if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel during a confrontation between the accused and a State agent. *Moulton*, 474 U.S. at 180.

As noted previously, we are to give deference to the trial court's factual findings. However, this rule does not mandate that we suspend logic or ignore uncontroverted evidence. While the trial judge

opined her decision turned on witness credibility, the fact that Coleman was initiating contact with the State for the purpose of negotiating a plea was uncontroverted.

Kim Parker testified at the suppression hearing. Parker was a deputy district attorney; she was an experienced prosecutor. She recalled receiving several messages from a person she thought was Coleman's aunt, although she could not recall whether she actually spoke with the person. The "aunt" was seeking some consideration in the charging of Coleman because of his lesser participation in the robbery. The "aunt" left a telephone number for Parker to return her calls, but Parker felt it was inappropriate to contact Coleman's aunt at that stage of the proceeding. Parker gave Detective Jacob the caller's name, so that Jacob could contact the caller.

Detective Jacob testified that Parker called him to say she had been receiving telephone calls or messages from Tiffany Mayson (Coleman's girlfriend, not aunt) advising Parker that Coleman wanted to make a deal. The officer sought to locate Mayson, but eventually spoke with her grandmother, Lynnette, who advised Jacob that Coleman was a good boy and that he wanted to cooperate or make a deal. Jacob's response was to advise Lynnette that Coleman was assigned an attorney and the police could not contact Coleman unless Coleman first contacted the police.

It is unclear as to why Parker believed it would be appropriate for law enforcement to contact the caller on behalf of the State if, as she testified, it was inappropriate for her to do so. Further, the State's assertion that Jacob was sent simply to advise the caller that another prosecutor was handling the case is puzzling. If it was inappropriate for Deputy District Attorney Parker to visit with the caller, why would it have been appropriate for Assistant District Attorney Kaufman to do so? What was the caller to do with Jacob's information, if Kaufman was also precluded from returning phone calls? If Parker chose to send a message to Coleman through Mayson via the police, rather than simply advising the public defender that his or her client wanted to discuss a plea, then the message should have been that Coleman should contact his attorney to initiate plea negotiations.

Kaufman argued at the suppression hearing: "As far as a courtesy call [to defense counsel], I understand what [the defense attorney is] saying. Law does not require it, though." We disagree. The rule permitting an end-run around the Sixth Amendment if a defendant initiates the contact does not apply to requests for plea negotiations. A prosecutor cannot enter into plea negotiations directly with a defendant who is represented by counsel; neither can a police officer. Otherwise, the purpose of the Sixth Amendment, *i.e.*, to protect the unaided layman at critical confrontations with his expert adversary, would be nullified. Plea negotiations are as critical a confrontation as a defendant will face during the adjudicatory process.

We do give deference to and accept the district court's findings that: (1) Coleman solicited the contact with Jacob the day of the interview; and (2) Coleman and/or Mayson set in motion the events that led to Jacob's interrogation. However, even in a light most favorable to the State, giving specific credence to the testimony of Detective Jacob, Coleman's message was clear: He wanted to make a deal. Jacob had no authority to effect a deal. The only conceivable purpose for Jacob's suggestion that Coleman contact him was to try to legitimize an uncounseled interrogation under the guise of plea negotiations. Jacob initiated the uncounseled interrogation of Coleman by suggesting that plea negotiations could not commence unless Coleman called the police. Detective Jacob knew that when Coleman asked to speak with him, Coleman was expecting plea considerations in return for his statement. Indeed, the trial judge observed that Coleman was intelligent and experienced in the ways of the criminal justice system. Giving deference to those observations, it is inconceivable that Coleman would contact police to make an uncounseled, gratuitous confession without expecting a quid pro quo from the State. At worst, the statements were obtained through misrepresentations that a plea offer was forthcoming. At best, any waiver of Coleman's Sixth Amendment right to counsel was not an intentional relinquishment or abandonment of a known right.

The State's argument on appeal suggests that police compliance with *Miranda* is sufficient to protect an accused's right to counsel

under the Sixth Amendment. Such an argument neglects the distinction between the accused's right to counsel under the Fifth Amendment and that under the Sixth Amendment. Coleman's initiation of contact with an agent of the State for the purpose of negotiating a plea while being represented by counsel is distinguishable from those cases in which a defendant initiates contact for the purpose of making a voluntary statement.

We acknowledge the State's contention that *Jackson* has been called into question by some members of the United States Supreme Court, citing *Texas v. Cobb*, 532 U.S. 162, 175-76, 149 L. Ed. 2d 321, 121 S. Ct. 1335 (2001) (KENNEDY, J., concurring). While some justices are apparently of the opinion that compliance with *Miranda* provides a sufficient protection of the Sixth Amendment right to counsel, *Jackson* nevertheless remains good law.

Coleman's motion to suppress the taped statement should have been granted. The remaining question is whether the trial court's error necessitates a new trial. Errors of constitutional magnitude may be held to be harmless if the appellate court can declare a belief that it was harmless beyond a reasonable doubt, *i.e.*, that the error had little, if any, likelihood of having changed the result of the trial. *State v. Fulton*, 269 Kan. 835, 845, 9 P.3d 18 (2000).

We cannot say that the erroneous admission of Coleman's confession was harmless error. Prior to the taped interview, Coleman made few, if any, incriminating statements to the police. Certainly, such damning evidence contributed to the jury's verdict. See *State v. Benoit*, 21 Kan. App. 184, 196-97, 898 P.2d 653 (1995). Consequently, Coleman's convictions are reversed, and the case is remanded for a new trial.

## *JURY INSTRUCTIONS*

Coleman argues that the district court erred in instructing the jury. First, he claims the district court committed reversible error when it inadvertently neglected to include PIK Crim. 3d 68.09 (1998 Supp.) on lesser included offenses in the jury instructions. Coleman also contends the district court erroneously refused to give his requested instruction defining premeditation.

As a preliminary matter, the parties disagree as to the applicable standard of review. Coleman requested both instructions at issue in his proposed instructions submitted to the district court, but he failed to lodge a timely objection to their exclusion.

Coleman contends that because he requested the instructions, our standard of review is "independent." See *State v. Sims*, 265 Kan. 166, 168, 960 P.2d 1271 (1998). In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Saleem*, 267 Kan. 100, 113, 977 P.2d 921 (1999).

The State argues that because Coleman failed to object to the exclusion of the requested instructions, the district court's failure to include the disputed instructions must be clear error. See K.S.A. 2001 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Evans*, 270 Kan. 585, Syl. ¶ 3, 17 P.3d 340 (2001).

In *State v. Pabst*, 273 Kan. 658, 44 P.3d 1230 (2002), the court opined that where no objection is made to the exclusion of a requested instruction, our standard of review is whether the instruction given properly and fairly stated the law as applied to the facts of the case and whether the instruction reasonably could have misled the jury. The court expressly disapproved of the State's argument, noting " '[i]t is well established that this court reviews a trial court's failure to give an instruction by a clearly erroneous standard where the party *neither requested the instruction nor objected to its omission*.' [K.S.A. 22-3414(3).]" 273 Kan. at 660 (citing *State v. Sperry*, 267 Kan. 287, 294, 978 P.2d 933 [1999]). With this standard of review in mind, we move on to the merits.

### *Lesser Included Offense*

At the conclusion of Coleman's jury trial, defense counsel requested the following instruction on lesser included offenses:

"The offense of Attempted Murder in the First Degree with which Mr. Coleman is charged includes the lesser included offenses of Attempted Second Degree Murder and Attempted Second Degree Murder, Unintentional.

"You may find Mr. Coleman not guilty, or guilty of Attempted First Degree Murder, Attempted Second Degree Murder or Attempted Second Degree Murder, Unintentional.

"*When there is reasonable doubt as to which of two or more offenses Mr. Coleman is guilty, he may be convicted of the lesser offense only.*

"Your presiding juror should sign the appropriate verdict form. The other verdict forms are to be left unsigned." (Emphasis added.) See PIK Crim. 3d 68.09 (1998 Supp.).

At Coleman's hearing on his motion for new trial, the trial judge acknowledged that PIK Crim. 3d 68.09 had originally been included in the jury instructions, but had somehow disappeared from the packet and was not given to the jury. The trial court, however, denied Coleman's motion for new trial.

Our courts have previously addressed the district court's failure to give PIK Crim. 3d 68.09. As Coleman points out, however, these cases were reviewed under the clearly erroneous standard of review. See *State v. Massey*, 242 Kan. 252, 262, 747 P.2d 802 (1987) (holding failure to give PIK Crim. 3d 68.09 is not clear error when PIK Crim. 3d 56.03 is also given); see also *State v. Trujillo*, 225 Kan. 320, 323-24, 590 P.2d 1027 (1979) (holding failure to give PIK Crim. 3d 68.09 not clearly erroneous when defense counsel did not request it). As a result, these cases are of limited assistance in the resolution of the issue on appeal.

Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused and are correct statements of the law. *State v. Crabtree*, 248 Kan. 33, Syl. ¶ 6, 805 P.2d 1 (1991). Despite the district court's failure to include the requested instruction on lesser included offenses, the jury here was nevertheless instructed that "[i]f you do not agree that the defendant is guilty of attempted first-degree murder in count one (1), you should then consider the lesser included offense of attempted second degree murder." See PIK Crim. 3d 56.03 (1999 Supp.). The two instructions, while worded differently, elicit the same result. The instruction given is a correct statement of the law and accurately informed the jury

that, if it had reasonable doubt as to Coleman's guilt on the first-degree murder charge, it was to consider the second-degree murder charge. The jury could not have been confused or misled by the omission of PIK Crim. 3d 68.09.

*PREMEDITATION*

Coleman also challenges the trial court's instruction on premeditation. The jury was instructed that "[p]remeditation means to have thought over the matter beforehand. There is no specific time element required to establish premeditation." Coleman requested that the jury be instructed that "[d]eliberately and with premeditation means to have thought over the matter beforehand. Premeditation means that there was a design or intent before the act; that is, that the accused planned, contrived and schemed beforehand to kill."

The pattern instruction, defining premeditation, PIK Crim. 3d 56.04(b)(1993 Supp.), states:

"Deliberately and with premeditation means to have thought over the matter beforehand.

"For authority, see *State v. McGaffin*, 36 Kan. 315, 13 Pac. 560 (1887), in which it is said: Premeditation means 'that there was a design or intent before the act; that is, that the accused planned, contrived and schemed beforehand to kill Sherman.' See also, *State v. Johnson*, 92 Kan. 441, 140 Pac. 839 (1914); *State v. Martinez*, 223 Kan. 536, 575 P.2d 30 (1978); and *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988), for approval of this instruction.

"Effective July 1, 1993, 'deliberately' is no longer included in the statutory definition of murder in the first degree."

The jury received the pattern instruction, *i.e.*, that premeditation means to have thought over the matter beforehand. The trial judge modified the instruction, adding the "no specific time element" language that was approved in, *e.g.*, *State v. Caenen*, 270 Kan. 776, 782, 19 P.3d 142 (2001). Coleman apparently does not take issue with the inclusion of this language. Instead, Coleman complains that the additional language he requested, which is referenced in the PIK instruction, was not included.

The use of PIK instructions is not mandatory, but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and unifor-

mity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such an adjustment. However, absent such a need, PIK instructions and recommendations should be followed. *State v. Whitesell*, 270 Kan. 259, 291, 13 P.3d 887 (2000).

The language Coleman requested, while referenced in the PIK instruction is not technically part of the instruction. Indeed, there is some question as to the propriety of the "planned, contrived and schemed" definition of premeditation. Our Supreme Court did use this definition in *State v. Thompkins*, 263 Kan. 602, 609, 952 P.2d 1332 (1998); however, the court subsequently noted that this definition did not displace the " 'to have thought over the matter beforehand' " definition. Further, the court remarked that the source of this language, *McGaffin*, was only of "historical interest." *Saleem*, 267 Kan. at 105. The court specifically observed that the " 'planned, contrived, and schemed' " language was *not* part of the PIK instruction. *Saleem*, 267 Kan. at 104-05. Additional evidence of the growing trend against using Coleman's proposed language may be found in the recently revised version of 56.04(b):

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

"For authority, see *State v. Holmes*, 272 Kan. 491, 33 P.3d 856 (2001); *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000); and *State v. Moncla*, 262 Kan. 58, 70-73, 936 P.2d 727 (1997).

"Effective July 1, 1993, 'deliberately' is no longer included in the statutory definition of murder in the first degree." PIK Crim. 3d 56.04(b) (2001 Supp.).

The district court did not err in refusing to instruct the jury in a manner that has now been disapproved by both our Supreme Court and the PIK committee.

The jury received an accurate statement of the applicable law. Because our courts have called into question the language Coleman sought to introduce, it cannot be said that such language is a correct

statement of the current law. Additionally, there is very little possibility that the jury was confused by the instruction given. The evidence of premeditation in this case is clear: Merrills' statement indicated that prior to the robbery, he considered killing the owner of the shop if he brandished a weapon during the robbery. The trial court did not err in instructing the jury.

## JUVENILE ADJUDICATIONS IN CRIMINAL HISTORY

Finally, Coleman argues the district court erred in including juvenile adjudications in his criminal history score. Specifically, Coleman contends that juvenile adjudications included in a criminal history score increase the penalty for a crime beyond the statutory maximum in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), as they were not required to be proven to a jury beyond a reasonable doubt. Our Supreme Court recently considered, and rejected, this exact argument in *State v. Hitt*, 273 Kan.224, Syl. ¶ 1, 42 P.3d 732 (2002).

Reversed and remanded for a new trial.

LEWIS, J., dissenting: I respectfully dissent from the majority opinion insofar as it holds that the Rasheem Coleman's confession to the police violated his Sixth Amendment rights and, thus, should be deemed inadmissible as evidence against him.

There were two different versions of the police contact with Tiffany Mayson's grandmother. If one were to believe the testimony of the police officers, nothing objectionable can be found as to their contact, and there is no Fifth or Sixth Amendment violation. It is perfectly obvious that the trial court, which was, after all, the finder of fact, chose to believe the testimony of the police officers and not that of the grandmother. The majority opinion simply ignores the trial court's findings of fact and bases its decision on its belief of the grandmother's version. As an appellate court we are not finders of fact and, in my judgment, the majority opinion violates our standard of review.

Our standard of review requires that we give great deference to the factual finding of the trial court. In my opinion, that has not been done in this case.

I believe the facts as testified to by the prosecution witnesses show that the police officers and prosecutors did not violate any of the defendant's rights. In the first instance, the deputy district attorney, to whom the defendant's girlfriend, Tiffany Mayson, had been making phone calls, was shifted off of the case and it was assigned to another assistant district attorney. Mayson was indicating in messages to the deputy district attorney that she wanted to discuss possible plea agreements for the defendant.

The prosecutor, quite appropriately, decided not to return Mayson's telephone calls. Instead, she asked the Wichita police to advise Mayson to redirect her inquiries to the attorney then in charge of the prosecution. The police detectives testified that they made an effort to find Mayson but were unable to do so. They ultimately spoke with her grandmother, who informed them that Mayson was "laying low." After receiving this information, the detectives asked Mayson's grandmother to pass along the message that Mayson's questions could be addressed to Assistant District Attorney Kaufman and not to Deputy District Attorney Parker. The grandmother mentioned to the detectives that the defendant was a good young man and he wanted to cooperate or make a deal. The detectives appropriately informed her that the defendant had already had counsel appointed and that they could not discuss it with him. They advised her that if he wanted to talk, the defendant had to contact them.

The grandmother's recollection of the conversation was different. According to her, the detectives told her they thought that the defendant was a good kid and did not have anything to do with the robbery. She also claimed the detectives told her they wanted the defendant to contact them so they could make a deal. She then relayed that message to the defendant.

It is from the grandmother's recollection of events only that the majority bases its decision. It concludes the detectives specifically asked the defendant to contact them. This is what the grandmother testified to; the detectives testified to the contrary.

In any event, the defendant received this information and did, in fact, contact the detectives, waive his *Miranda* rights, and admit

in writing that he had initiated the contact with the police. He then admitted his involvement in the robbery.

Based on the testimony of the police officers and other prosecution witnesses, I see no objection whatsoever to the admission of the defendant's confession. The trial court denied the defendant's motion to suppress, noting the issue came down to the credibility of witnesses. The trial judge believed the police officers, she believed the defendant and his girlfriend solicited the police interview, and she admitted the tape of the defendant's confession into evidence. The majority concedes that the defendant's Fifth Amendment right was not violated and that the defendant had waived his Fifth Amendment right.

The only way in which the defendant's statement can be excluded is based on the Sixth Amendment right to counsel, which is seldom analyzed or approached in cases of this nature.

In *Jackson v. United States*, the United States Supreme Court held that any waiver of counsel after counsel has been appointed during a *police-initiated custodial review* is ineffective.

The majority opinion admits that the issue on the Sixth Amendment right to counsel comes down to whether the State's conduct constituted an initiation of contact. The majority finds that it did, a finding which I believe to be totally without support in the evidence. The majority reaches the conclusion that the prosecution and the police officers used knowledge to *extract* an uncounseled confession.

The majority opinion ignores the fact that the defendant in his *Miranda* rights waiver acknowledged in writing that *he had initiated the contact with the police*. The testimonies of the police officers indicate it was the defendant and not them who initiated the contact. It is only if one believes the testimony of the grandmother and ignores the balance of the evidence in this case that one can even reach a tentative thought that the police extracted this confession from the defendant or that the police initiated the contact with the defendant.

There is some suggestion in the majority opinion that it makes a difference whether the defendant wanted to plea bargain or make a statement. I see no difference. For whatever reason, the defend-

ant initiated the contact with the police and waived his Sixth Amendment right.

I believe the majority opinion is wrong and that it violates our standard of review. I further believe it violates admitted facts made by the defendant in his waiver of a *Miranda* hearing. In essence, I believe the majority has invaded the trial court's right as the finder of fact, and I would affirm the trial court and the defendant's conviction.