No. 86,968

STATE OF KANSAS, *Appellee*, v. RASHEEM A. COLEMAN, *Appellant*.

69 P.3d 1097

Review of the judgment of the Court of Appeals in 30 Kan. App. 2d 988, 56 P.3d 290 (2002).

Opinion filed May 30, 2003.

*Patrick H. Dunn*, assistant appellate defender, argued the cause, and *Craig Durham*, assistant appellate defender, and *Steven R. Zinn*, deputy appellate defender, were with him on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Following a jury trial, Rasheem Coleman was convicted of attempted premeditated first-degree murder and aggravated robbery. On direct appeal, the Court of Appeals, in a published opinion from which one judge dissented, reversed and remanded for a new trial, ruling that the trial court's failure to suppress Coleman's inculpatory statement violated his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution. *State v. Coleman*, 30 Kan. App. 2d 988, 56 P.3d 290 (2002). Pursuant to K.S.A. 20-3018(b), this court granted the State's petition for review but denied Coleman's cross-petition in which he sought review of three additional issues decided against him by the Court of Appeals.

While the overarching issue is whether Coleman's Sixth Amendment right to counsel was violated, the State in its petition for review presents sub-issues of whether the Court of Appeals: reweighed the evidence and failed to give deference to the factual findings of the trial court; erred in its legal analysis of whether a defendant can waive his or her Sixth Amendment right to counsel when discussing a plea agreement; and erred in applying the harmless error analysis. We affirm the trial court and reverse the Court of Appeals, finding that Coleman exercised a valid waiver of his Sixth Amendment right to counsel before giving his statement to police.

### Coleman's Statement

On September 11, 2000, Aaron Douglas and Mario Merrills entered the Gold and Diamond Traders jewelry store in Wichita. Merrills shot the owner of the store in the chest. The men took $450 in cash and various items of jewelry from the store.

Rasheem Coleman's involvement in these crimes was as an aider and abettor. Coleman knew the store's owner, his security practices, and the store layout. He shared this information in helping to plan the robbery. Coleman and his girlfriend, Tiffany Mayson, drove Douglas and Merrills to the store and waited outside while the robbery took place. Coleman had a walkie talkie with which he could communicate with Douglas and Merrills. Coleman and Mayson picked up Douglas and Merrills after the robbery and disposed

of the t-shirts Douglas and Merrills had been wearing. Douglas and Merrills divided the jewelry that had been taken during the robbery, giving some to Coleman.

Coleman made three statements to police. The day after the robbery, Coleman and Mayson were pulled over because their car matched the description of a car seen at the robbery. Police found jewelry in the car and a business card from Gold and Diamond Traders. Coleman was questioned for 10 to 15 minutes, and Coleman told police he knew the owner of Gold and Diamond Traders but denied any involvement in the robbery. Coleman was not arrested at that time.

Police contacted Coleman again on September 28, 2000, and he agreed to return to their office for questioning. After being advised of his *Miranda* rights, Coleman signed a waiver and agreed to talk to police without an attorney present. Coleman told police that, on the day of the robbery, Douglas and Merrills came to his house and he and Mayson gave them a ride to Gold and Diamond Traders. Coleman denied any knowledge of the robbery either before or after he took Douglas and Merrills to the jewelry store.

The full extent of Coleman's participation was made clear by his October 18, 2000, statement in which he described planning and carrying out the robbery.

### The Suppression Hearing

Coleman moved to suppress all three statements, but only the third statement is at issue in this appeal. At the suppression hearing, the following facts were elicited regarding Coleman's third statement given on October 18, 2000:

Coleman was charged and jailed on September 28, after Coleman made his second statement to police. At his first appearance, Coleman requested a court-appointed attorney and the public defender's office was appointed. While Coleman was in jail, Mayson attempted to contact Assistant District Attorney Kim Parker to find out what was going on with Coleman's case. Although Coleman did not initially ask Mayson to call the district attorney's office, when he learned that she had been attempting to talk to Parker, he told Mayson to ask why he was being charged.

Parker testified she had received phone messages from someone she believed to be Coleman's aunt who thought Coleman was a lesser participant in the event and wanted some consideration for him. Parker gave Detective Jacob the woman's name so he could contact her and tell her that Parker was no longer handling the case.

Detective Jacob testified that on October 17, he and Detective Nevil attempted to contact Mayson to relay Parker's message that Mayson should direct her questions to Assistant District Attorney David Kaufman because he was assigned to Coleman's case rather than Parker. The detectives went to Mayson's home and spoke with her mother, who then directed them to the home of Lynettee Mayson, Mayson's grandmother, thinking Mayson might be there. The detectives spoke with Lynettee, who told them Mayson was "laying low." Detective Jacob relayed Parker's message. According to Detective Jacob, Lynettee told him that Coleman was a good boy and he wanted to cooperate or make a deal. Detective Jacob advised Lynettee that Coleman had been appointed an attorney and that "we cannot contact him unless he contacts us." Lynettee took down Kaufman's name and said she would give the message to Mayson.

Detective Nevil, who accompanied Detective Jacob to Lynettee's house, was asked only a few questions at the hearing. He testified: "The message we wanted to get across to the grandmother was that Kim Parker was not the attorney on the case and that if she had a message or if she had information for the district attorney, she should get in touch with District Attorney David Kaufman." Detective Nevil was asked whether he or Detective Jacob said anything to Lynettee about making a deal. He responded, "That absolutely did not happen."

Lynettee remembered the conversation with the detectives differently. She testified the detectives told her that they thought Coleman was a good kid, they did not believe Coleman had anything to do with the robbery, and they would like Coleman to contact them so they could make a deal with him. Lynettee then talked to Coleman the next day and told him the detectives wanted him to call them to make a deal.

Coleman testified that Lynettee told him the detectives had come looking for Mayson and said they wanted to talk to him but could not contact him because he had an attorney and that he had to initiate the contact. Coleman testified he stayed up all night thinking and praying about whether he should call the police. The next day, Coleman called Detective Jacob from the jail. Coleman stated "it was not in . . . my mind" to call his attorney, even though he knew her name and had already met with her.

When Coleman called Detective Jacob, the detective knew that charges had been filed and an attorney had been appointed for Coleman. He did not inform either the district attorney or Coleman's court-appointed attorney that Coleman had contacted him. Detective Jacob went to the jail and took Coleman into an interview room. Before engaging in any substantive discussion, Detective Jacob presented Coleman with a form which included the *Miranda* rights and asked Coleman to read each right aloud and initial each one if he understood the information. Coleman did so. Coleman then signed the waiver of rights and also wrote at the bottom of the form: "I called the detectives around 10:30 a.m. from my pod, and I asked them to come and speak with me." During the interview, which lasted 60 to 90 minutes, Coleman never requested an attorney and never stated that he wished to end the interview.

Coleman stated that after filling out the *Miranda* waiver form, he asked why the detectives had wanted to talk to him. According to Coleman, the detectives told him the district attorney's office was the one that would make any deals. Coleman testified that the detectives told him they would call the district attorney's office as soon as the interview was over but that he would have to give them some information to relay in order to work out a deal.

### Rulings Regarding Coleman's Motion to Suppress

The trial court denied Coleman's motion to suppress his statement to police. In ruling on the motion, the trial court commented that Coleman was obviously bright, intelligent, well spoken, thoughtful, and mature. After detailing Coleman's criminal history, the court noted that Coleman's contact with defense lawyers was "somewhat significant for someone his age" and that Coleman was

not naive about the criminal justice system since he had been in prison, in a conservation camp, and on probation.

Turning specifically to Coleman's interview statement on October 18, the trial court stated that resolution of the issue required weighing the credibility of the witnesses. The trial judge concluded:

"[T]his interview on October 18 was essentially initiated through the contacts that Tiffany Mayson and perhaps this aunt had with Ms. Parker. . . . Detective Jacob testified and his testimony was supported by the testimony of Detective Nevil, that they went to that home to basically inform Ms. Mayson of the new attorney, of the different attorney, it is clear that this whole situation had its genesis in the actions of both Mr. Coleman and Tiffany.

"They went to that home not to solicit a statement from Mr. Coleman. I am convinced from the evidence that they went there solely in an investigative manner or whatever, but it was not to solicit a statement from Mr. Coleman. I am convinced from the evidence, clearly convinced from the evidence that they did nothing improper in their conversation with Ms. Mayson. . . . I find that Mr. Coleman on his own solicited the contact . . ., but all the events . . . were initiated by Mr. Coleman and . . . I find that the statement is admissible."

The interview statement was admitted at trial, over the renewed objection of defense counsel, and Coleman was convicted of attempted premeditated first-degree murder and aggravated robbery.

The Court of Appeals' majority analyzed the trial court's failure to suppress Coleman's statement under both the Fifth and Sixth Amendments to the United States Constitution. The majority found no violation of the Fifth Amendment because Coleman never invoked his right to counsel during police questioning. The majority also noted that Coleman did not challenge the voluntariness of his confession; therefore, it did not consider whether Coleman's waiver of his *Miranda* rights was induced by an unfulfilled promise of a favorable plea arrangement. 30 Kan. App. 2d at 994. Coleman did not seek review of these holdings.

The Court of Appeals' majority reached a different result under its Sixth Amendment analysis, concluding the police attempted to contact Coleman via Mayson and in doing so knowingly circumvented Coleman's right to the assistance of counsel. 30 Kan. App. 2d at 998-99. Further, the majority concluded: "The rule permitting an end-run around the Sixth Amendment if a defendant ini-

tiates the contact does not apply to requests for plea negotiations. A prosecutor cannot enter into plea negotiations directly with a defendant who is represented by counsel; neither can a police officer." 30 Kan. App. 2d at 998. According to the majority opinion, "at best" Coleman's statement was "not an intentional relinquishment or abandonment of a known right" because compliance with *Miranda* was not sufficient to protect Coleman's right to counsel under the Sixth Amendment and "at worst" the statement was "obtained through misrepresentations that a plea offer was forthcoming." 30 Kan. App. 2d at 998.

The dissent noted that the majority ignored the trial court's findings of fact. "It is only if one believes the testimony of the grandmother and ignores the balance of the evidence in this case that one can even reach a tentative thought that the police extracted this confession from the defendant or that the police initiated the contact with the defendant." 30 Kan. App. 2d at 1006. Further, the dissent disagreed with the determination that, under a Sixth Amendment analysis, an accused who wishes to make a plea agreement cannot waive his or her right to counsel. 30 Kan. App. 2d at 1006-07.

## Coleman's Sixth Amendment Rights

The question in this case is not whether Coleman had the right to assistance of counsel at his interview with the police. Clearly, the Fifth Amendment right to counsel had attached because the interrogation was custodial. *Edwards v. Arizona*, 451 U.S. 477, 484-87, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *Miranda v. Arizona*, 384 U.S. 436, 470, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Further, it is not disputed that Coleman had the right to counsel under the Sixth Amendment since the interrogation was subsequent to arraignment and Coleman's assertion of his right to counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991); *Michigan v. Jackson*, 475 U.S. 625, 636, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986); *United States v. Gouveia*, 467 U.S. 180, 188, 81 L. Ed. 2d 146, 104 S. Ct. 2292 (1984).

The issue raised by Coleman's motion to suppress was whether, after he had invoked his right to counsel, he validly waived the right.

Judicial interpretation of the Sixth Amendment right to counsel and waiver of that right draws heavily upon and has evolved from cases applying the Fifth Amendment right to counsel, primarily *Edwards*, 451 U.S. 477. The United States Supreme Court in *Edwards* applied the Fifth Amendment protection against compelled self-incrimination and held that a person in custody, who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. Reiterating this holding, the Supreme Court has indicated that *Edwards* established a "bright-line rule" such that "once a suspect has invoked his right to counsel, any subsequent conversation must be initiated by him." *Solem v. Stumes*, 465 U.S. 638, 641, 646, 79 L. Ed. 2d 579, 104 S. Ct. 1338 (1984).

The holding in *Edwards* was applied in a Sixth Amendment context in *Jackson*, 475 U.S. at 636, when the United States Supreme Court determined that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."

Two years after its decision in *Jackson*, the United States Supreme Court examined whether and how an accused could waive his or her Sixth Amendment right. In *Patterson v. Illinois*, 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988), the Court clarified that the "essence" of *Edwards* and its progeny was to preserve the integrity of an accused's choice to communicate with police only through counsel, not to bar

"an accused from making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. If an accused 'knowingly and intelligently' pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial." 487 U.S. at 291.

Second, the Court rejected the defendant's argument that the *Miranda* warnings were not sufficient to make his waiver of counsel an intentional relinquishment or abandonment of a known right or privilege. 487 U.S. at 292-93. The Court held: "[A]n accused who is admonished with the warnings prescribed by this Court in *Miranda* [citation omitted] has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." 487 U.S. at 296.

In *Patterson*, the United States Supreme Court explicitly rejected the contention that it should be more difficult for an accused to waive his or her Sixth Amendment right to counsel:

"While our cases have recognized a 'difference' between the Fifth Amendment and Sixth Amendment rights to counsel, and the 'policies' behind these constitutional guarantees, we have never suggested that one right is 'superior' or 'greater' than the other, nor is there any support in our cases for the notion that because a Sixth Amendment right may be involved, it is more difficult to waive than the Fifth Amendment counterpart." 487 U.S. at 297-98.

Thus, the United States Supreme Court, through *Edwards, Jackson, Patterson,* and their progeny, has made it clear that steps must be taken to preserve an accused's choice to communicate with police only through counsel if that is the election made by an accused. However, these decisions do not bar an accused from initiating contact with police after counsel has been appointed and making a statement to police after a knowing and intelligent waiver of his or her right to counsel.

This court has also ruled that a defendant may waive his or her Sixth Amendment right to counsel. See *State v. Johnson,* 255 Kan. 140, 148-50, 871 P.2d 1246 (1994) (rejecting argument that uncounseled statement should have been suppressed because it was obtained in violation of disciplinary rule prohibiting lawyer from communicating with person represented by counsel); *State v. William,* 248 Kan. 389, 413-14, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (when defendant initiates contact with police to discuss crime after assertion of Sixth Amendment rights, defendant waives right to counsel and statements are admissible); *State v. Johnson,* 223 Kan. 237, 243, 573 P.2d 994 (1977) (accused may waive right

to have counsel present during any police interrogation even though accused has previously retained counsel).

## Initiation of Contact

Thus, the initial inquiry is whether Coleman initiated the interrogation by his contacts with police. The State argues that the Court of Appeals' majority erred by reweighing the evidence and finding that the police initiated contact with Coleman for the purpose of plea negotiations. The standard of review on a suppression issue is well settled and is the difference in the analysis of the Court of Appeals' majority and dissenting opinions. "When reviewing a trial court's decision as to suppression of evidence, an appellate court normally gives great deference to the factual findings of the trial court, but the ultimate determination of the suppression of evidence is a legal question requiring independent appellate determination." *State v. Henry*, 273 Kan. 608, Syl. ¶ 2, 44 P.3d 466 (2002); *State v. Shively*, 268 Kan. 589, Syl. ¶ 1, 999 P.2d 259 (2000). See *Arizona v. Fulminante*, 499 U.S. 279, 285-87, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991).

The majority of the Court of Appeals noted this standard of review and adopted the trial court's findings that Coleman solicited the contact with the detectives the day of the interview which set in motion the events that led to the interrogation. However, the majority cited *Maine v. Moulton*, 474 U.S. 159, 176, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985), a case in which police surreptitiously recorded an accused's postarraignment conversation with his codefendant; and the United States Supreme Court stated the States have an affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking the right to counsel. Comparing this case to those facts, the Court of Appeals determined that the police in this case circumvented Coleman's rights by attempting to contact him via Mayson and then stated: "The only conceivable purpose for Jacob's suggestion that Coleman contact him was to try to legitimate an uncounseled interrogation under the guise of plea negotiations." 30 Kan. App. 2d at 998.

These conclusions were contrary to the trial court's findings and, therefore, were also contrary to the applicable standard of review. When reviewing the factual underpinnings of a district court's decision, an appellate court does not reweigh the evidence but examines whether there was substantial competent evidence to support the district court's findings. *State v. Washington*, 275 Kan. 644, Syl. ¶ 4, 68 P.3d 134; *State v. Toothman*, 267 Kan. 412, 416, 985 P.2d 701 (1999).

There was substantial competent evidence to support the trial court's findings in this case. As noted in the Court of Appeals' dissenting opinion, the conclusion reached by the majority gave credence to the testimony of Lynettee Mayson and ignored contrary testimony by the detectives and other witnesses. There was substantial competent evidence that the police were attempting to contact Tiffany Mayson, a witness and possible participant in the crimes, for investigative purposes and did not have an improper motive in seeking to find her.

Further, there was substantial competent evidence that Coleman initiated contact with the police. In *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983), within a Fifth Amendment context, a plurality of the Court determined that a defendant "initiates" an interrogation if he or she "evince[s] a willingness and a desire for a generalized discussion about the investigation." This definition has been applied in a Sixth Amendment context. *E.g., Owens v. Bowersox*, 290 F.3d 960, 963 (8th Cir.), *cert. denied* 537 U.S. 1035 (2002).

In *Owens*, a defendant's mother contacted police, stating she had persuaded her son to talk to police and tell the truth. The trial court found that the impetus for the interrogation came from defendant through his mother, although the defendant did not contact police himself and did not ask his mother to have the police come to the jail. The Eighth Circuit Court of Appeals upheld the finding, noting that a defendant may evince a willingness and desire to discuss a crime by communicating to police through a third party. 290 F.3d at 963-64. See *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir.), *cert. denied* 531 U.S. 1021 (2000).

In this case, the contact began with Mayson calling the State. Although Coleman did not initially ask Mayson to place the calls, when he found out she was doing so he asked her to find out why he was being charged. When contact was made with Mayson's grandmother, substantial evidence supported the conclusion that it was the grandmother who raised the issue of a possible plea bargain. The police responded with a correct statement of the law that they could not contact him. Under the facts of *Owens*, it was at that stage, with no more contact from the accused, that the police interrogated the defendant. Here, however, the next contact came from Coleman. Coleman testified he stayed up all night considering whether to call the police and praying about the decision. Regarding the telephone call to Detective Jacob on October 18, Coleman testified: "I told them that I had received a message that Ms. Mayson—yeah, Ms. Mayson that I would like to speak with them regardless of that, and if it was possible I could speak with them, if it was okay to come down and talk to me." This and other portions of Coleman's testimony and the general course of the interview as described by Coleman evince a willingness and a desire for a generalized discussion about the investigation, a willingness that arose regardless of the police contact with Mayson.

Again, there was substantial competent evidence to support the trial court's findings, and the Court of Appeals erred in reweighing the evidence and failing to give deference to the findings of the trial court.

### *Waiver of Miranda Rights*

Next, the State argues that the Court of Appeals' majority erred in its application of United States Supreme Court precedent and Kansas Supreme Court precedent regarding waiver of a defendant's Sixth Amendment right to counsel. The State argues that a defendant may waive the right to have counsel present during police interrogation, even after formal charges have been filed and the Sixth Amendment right to counsel has been invoked. The State also argues that *Miranda* warnings were sufficient to inform the defendant of his rights in this case.

The Court of Appeals ignored the precedent of *Patterson's* holding that an accused who is admonished with the *Miranda* warnings has been sufficiently apprised of the nature of his or her Sixth Amendment rights, and of the consequences of abandoning those rights, so that his or her waiver of rights on this basis will be considered a knowing and intelligent one. *Patterson*, 487 U.S. at 292, 296.

The Court of Appeals' majority also determined that the rules permitting an "end run" around the Sixth Amendment did not apply when there was discussion of a possible plea agreement. The State correctly points out that the majority cited no authority for its creation of a special rule regarding plea negotiations. The State cites two cases from other jurisdictions which held that a defendant may waive his or her Sixth Amendment right to counsel even when initiating plea negotiations: *State v. Ruth*, 102 Idaho 638, 637 P.2d 415 (1981), and *State v. Card*, 188 Ill. App. 3d 213, 544 N.E.2d 94 (1989). Certainly, a defendant should be allowed to waive his or her right to counsel for the purpose of plea negotiations the same as he or she may waive representation at trial. We leave to another day the issue of whether to require a more searching or formal inquiry as to advising the defendant of the full "dangers and disadvantages of self-representation" when negotiating a plea. *Patterson*, 487 U.S. at 298-300 (discussing spectrum of Sixth Amendment right to counsel and recognizing that dangers and disadvantages of self-representation may differ and be more obvious to accused at various stages of proceedings).

The issue does not arise in this case because Coleman never alleged that he believed the police had the authority to negotiate a plea. Coleman's testimony at the suppression hearing clearly indicates the police told him that only the district attorney's office had such authority.

In its analysis of the Fifth Amendment, the Court of Appeals noted Coleman had not raised the issue of whether his waiver was involuntary. Therefore, the Court of Appeals stated it would not consider whether the police's promise to visit with the district attorney was an unfulfilled promise to plea bargain causing Coleman's statement to be involuntary. 30 Kan. App. 2d at 994.

Yet, the Court of Appeals discussed the same issue in the Sixth Amendment context and concluded that Coleman's waiver of his Sixth Amendment rights was involuntary. 30 Kan. App. 2d at 998-99. This issue arose only because the Court of Appeals improperly reweighed the evidence and reached a different conclusion than did the trial court.

Findings by the trial court, after an evidentiary hearing, that a statement was freely and voluntarily made should be accepted on appeal if the findings are supported by substantial competent evidence. *State v. Banks*, 260 Kan. 918, Syl. ¶ 4, 927 P.2d 456 (1996). In this case, there was substantial competent evidence to support the trial court findings. As previously noted, Coleman understood that the police did not have authority to negotiate a plea agreement. Further, there was no evidence that the conduct of the police caused or was likely to cause Coleman to make a false statement. This court has stated:

"In order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official, the promise must be such as would likely cause the accused to make a false statement to obtain the benefit of the promise, and the promise must be made by a person whom the accused reasonably believed to have the power or authority to execute it. [Citation omitted.]" *Banks*, 260 Kan. at 925.

See also *State v. Johnson*, 253 Kan. 75, 84, 853 P.2d 34 (1993) (law enforcement officer's statement he would go to district attorney and tell if defendant cooperated did not mean that officer bargained with or promised defendant anything directly or by implication).

In this case, there was substantial competent evidence, including Coleman's testimony, that the statements of police were not of a coercive nature and not likely to induce a false statement. The trial court did not err in determining that the police's conduct did not render Coleman's statement inadmissible.

### Conclusion

There was substantial competent evidence that Coleman initiated the contact with police and evinced a willingness for a generalized discussion of the investigation. He was advised of his *Mir-*

*anda* rights and knowingly, intelligently, and voluntarily waived his Sixth Amendment right to counsel. The trial court did not err in admitting the statement. Given this determination, it is not necessary to address the issue of whether admission of the statement was harmless error.

We reverse the Court of Appeals' holding that Coleman's October 18, 2000, statement should be suppressed and affirm the trial court.

ABBOTT and GERNON, JJ., not participating.
LARSON, S.J., and WAHL, S.J., assigned■