No. 94,002

STATE OF KANSAS, *Appellee*, v. DONNIE RAY VENTRIS, *Appellant*.

(176 P.3d 920)

Rev'd 556 U.S. ____,

Opinion filed February 1, 2008.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Linda E. DeWitt*, special counsel, of Phalen, Bicknell & Markle Law Offices, of Coffeyville, argued the cause, and *F. William Cullins*, county attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Donnie Ventris petitioned this court to review the Court of Appeals' decision affirming his convictions for aggravated robbery and aggravated burglary. Ventris asserts that the district court improperly admitted impeachment testimony from a jailhouse informant who had been surreptitiously planted in his jail cell by the State; that the district court improperly admitted evidence in violation of K.S.A. 60-455; and that his sentence should be reversed because the determination of his criminal history was not proven to a jury beyond a reasonable doubt.

The following facts are taken from the Court of Appeals' decision:

"Sometime in the last part of 2003, Ventris met and began living with Rhonda Theel in a romantic relationship. At some point, Theel learned from another friend, Kim Eytcheson, about the victim in this case, Ernest Hicks. She heard that Hicks was abusing the children of his live-in girlfriend, Helen Cargile. She also

heard that Hicks was wealthy and carried $500 to $600 on his person. Eytcheson was also a friend of Cargile.

"On January 6, 2004, and into the early morning hours of January 7, 2004, Theel and Ventris were using methamphetamine and marijuana at their home. Neither had slept for a couple of days. At approximately 6 a.m., Theel suggested to Ventris that they go to Hicks' residence so she could talk to Hicks about the alleged child abuse. Theel called Eytcheson to find out when Cargile's children left for school. Theel also called another friend, Martha Denton, and asked Denton to meet her and Ventris at 'Pump Station Road.' Theel wanted Denton to give her and Ventris a ride to Hicks' residence, because she thought it would be best not to drive Ventris' car all the way to Hicks' house.

"Denton did not know why Theel wanted to meet her at Pump Station Road. Nevertheless, she proceeded to the meeting place with her boyfriend, Keith Holt. By this time, Ventris and Theel had arrived at the meeting place in Ventris' truck and began watching Hicks' residence, waiting for Cargile to leave with her children. When Denton and Holt arrived, Theel asked Holt to take her and Ventris to Hicks' residence and told Denton to take Ventris' truck with her. Denton and Holt complied.

"Theel gave Holt directions to Hicks' residence. She also told him that she and Ventris were going there so a guy could show them a dog. As they arrived at Hicks' residence, Theel noted that Hicks' truck was in the driveway and told Holt to drive past the house, turn around, head back towards the residence, and turn into the driveway next to Hicks' truck. Ventris 'never said a word.'

"After Holt pulled into the driveway, Theel exited the vehicle and told Ventris to wait while she went to the door and knocked. Theel had also told Holt he could leave, because the guy living at the house was supposed to give her and Ventris a ride back. According to Holt's trial testimony, Ventris waited behind a black pickup while Theel knocked on the door. As Holt pulled out of the driveway, he saw Ventris pull a ski mask down over his face, but Holt could not tell whether the ski mask left Ventris' face open or covered everything but his eyes. The outside temperature was 5 to 10 degrees that morning.

"While Theel and Ventris were inside Hicks' residence, one or both of them shot and killed Hicks with a .38 revolver, took his wallet containing approximately $300, and a cell phone. Theel drove herself and Ventris in Hicks' truck to a secluded spot in Oklahoma where she sprayed the truck with cleaner to get rid of any fingerprints. The two of them then walked to a convenience store. On the way, Theel tried unsuccessfully to disassemble the murder weapon. One of them disposed of the gun in a culvert.

"At the convenience store, Theel called Denton and asked her for a ride home. Denton and Holt eventually picked Theel and Ventris up at the store and took them back to their home in Kansas. Sometime later, Denton and Holt contacted the police after developing a suspicion that Theel and Ventris had something to do with Hicks' murder. Police arrested both Theel and Ventris and charged them each with several crimes.

"Theel entered into a plea bargain in exchange for her testimony against Ventris. Specifically, she pled guilty to aggravated robbery and aiding a felon. The State tried Ventris before a jury on charges of felony murder, aggravated robbery, aggravated burglary, felony theft, and misdemeanor theft. Theel, Ventris, and a former cellmate of Ventris' all testified at trial. Both Ventris and Theel denied taking a gun to Hicks' residence, and they both claimed the reason for going to the residence was for Theel to talk to Hicks about the alleged child abuse. However, each related a different version of the events that occurred after arriving at Hicks' residence.

"Highly summarized, Theel testified as follows. As she was waiting for Hicks to come to the door, she saw a frightened look on Hicks' face and then Ventris quickly passed her and entered the house. She then entered and almost immediately saw Hicks on the floor and Ventris standing over him. She heard them arguing. She then saw that Ventris had a .38 revolver and heard him ask Hicks about money. She attempted to stop the two from arguing by dousing them with a cleaner she retrieved from the kitchen and by also hitting Hicks with a stick. Hicks produced a wallet and Ventris said, 'All this for 40 or 50 dollars?' The two men walked to the bedroom after Hicks said he had more money there. Theel then heard two shots and saw Ventris come out of the bedroom. She claimed Ventris said, 'I have to shoot him again,' to which she responded, 'Okay.' According to her testimony, she then left the house and at some point heard a third shot. Ventris then came out of the house and threw Hicks' truck keys to her. She used the keys to gain access to Hicks' truck and drove herself and Ventris away from the scene.

"Ventris, as one might anticipate, offered a different version as follows. He testified that he only went with Theel on the day in question to 'shut her up' since she had been talking for days about Hicks committing child abuse. He denied hearing about Hicks and his money. He also denied taking a gun with him and did not know if Theel had one. He denied knowing that Theel had called Denton to arrange a ride, but he admitted going to the meeting place where they met Denton and Holt. There he and Theel entered Holt's car and traveled to Hicks' house. Once there, Hicks became agitated with Theel over her accusations of child abuse. A scuffle ensued between himself and Hicks, and Theel threw a liquid in Hicks' face and hit him with a stick. Theel then pulled out a gun and asked Hicks for his wallet. Ventris asked her what she was doing, and she replied that he should mind his own business. Hicks said his wallet was in the bedroom, and she told him to go get it. Theel and Hicks went into the bedroom, and Theel shot him. Ventris started to leave and then heard two more shots. He denied taking anything with him when he left. He got into the truck with Theel only after she said she would take him to his truck. Nevertheless, they continued on to a gas station where he purchased gas with money Theel gave him.

"As stated earlier, the State also offered at trial the testimony of Johnnie Doser, Ventris' former cellmate, as a rebuttal witness. Prior to trial, the State recruited Doser to share a cell with Ventris and to 'keep [his] ear open and listen' for

incriminating statements. According to Doser, Ventris told him that he and his girlfriend 'went to rob somebody and that it went sour.' Ventris allegedly said he shot a guy in the head and chest and took his keys, his wallet, about $350, and a vehicle. In exchange for Doser's testimony, the State released him from probation. Ventris objected to the testimony, claiming the State had obtained the statements in violation of his Sixth Amendment right to counsel. The State conceded the Sixth Amendment violation but argued the testimony could be used for impeachment purposes. The trial court allowed Doser to testify.

"Prior to closing arguments, the trial court instructed the jury to 'consider with caution' the testimony of both Doser and Theel. The jury deliberated for approximately 2 hours and acquitted Ventris of felony murder and misdemeanor theft. However, the jury found him guilty of aggravated burglary and aggravated robbery. The court had previously dismissed the felony theft charge due to a lack of evidence. Later, the court sentenced Ventris to 247 months for aggravated robbery and 34 months for aggravated burglary." Slip op at 3-8, *State v. Ventris*, No. 94,002, unpublished opinion filed September 15, 2006.

The Court of Appeals affirmed Ventris' convictions and sentences. *Ventris*, slip op. at 17. Ventris petitioned this court to review the Court of Appeals' decision, and we granted his petition.

For his first issue, Ventris claims that the district court erroneously admitted testimony from his former cellmate, who had been surreptitiously placed in Ventris' jail cell to obtain incriminating statements. Ventris claims that his former cellmate's testimony violated his Sixth Amendment right to counsel.

When an appellate court reviews the district court's decision regarding the suppression of evidence, it gives deference to the trial court's factual findings but applies a de novo standard to the ultimate legal determination of whether the evidence should have been suppressed. *State v. Coleman*, 275 Kan. 796, 805, 69 P.3d 1097 (2003).

The State concedes that it violated Ventris' Sixth Amendment right to counsel when it surreptitiously planted Doser in Ventris' jail cell as a human listening device. Nevertheless, the State argues that the evidence is only precluded from its case-in-chief. The State asserts that it can use the illegally obtained statements in rebuttal to impeach Ventris' testimony.

To support its argument, the State relies on *Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). In *Harris*, the defendant was charged with selling heroin to an undercover police

officer. After Harris was arrested, he made several incriminating statements to the officers without the benefit of proper *Miranda* warnings. Harris testified in his defense, stating that he had sold baking powder to the officers as part of a scheme to defraud drug purchasers. On cross-examination, the State attempted to impeach Harris' testimony by inquiring about several contradictory statements Harris had made after his arrest. The State conceded that the statements were inadmissible in its case-in-chief because they were obtained without *Miranda* warnings but asserted that the statements were admissible for impeachment. 401 U.S. at 223-24.

In a five-to-four decision, the United States Supreme Court agreed with the State. *Harris*, 401 U.S. at 224-25. The *Harris* Court relied on *Walder v. United States*, 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354 (1954), which allowed the admission of illegally obtained physical evidence to impeach the defendant even though the evidence was not admissible in the government's case-in-chief. *Harris*, 401 U.S. at 224-26. Stating that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from risk of confrontation with prior inconsistent utterances," the *Harris* Court concluded that the Court's truth-seeking function outweighed the protection against self-incrimination afforded by *Miranda*. 401 U.S. at 226.

In *Oregon v. Hass*, 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975), the United States Supreme Court extended the holding in *Harris* to include statements made in violation of a defendant's Fifth Amendment right to counsel. Hass was arrested for stealing bicycles. The police advised Hass of his *Miranda* warnings at the time of his arrest. Hass requested to speak with his attorney and was advised that he could call an attorney when they arrived at the police office. On the way there, Hass pointed out the houses where the bicycles had been stolen and the location of a stolen bicycle. At trial, Hass testified that he did not know his friends were going to steal bicycles or from where the bicycles had been stolen. To impeach this testimony, the State admitted the statements Hass had made after his arrest. 420 U.S. at 715-17. The *Hass* Court affirmed the use of the defendant's statements to im-

peach his testimony, finding no evidence or suggestion that the statements were involuntary or coerced. 420 U.S. at 722.

This court has applied the United States Supreme Court's analysis in *Harris* and *Hass*. In *State v. Osbey*, 213 Kan. 564, 573-74, 517 P.2d 141 (1973), the defendant claimed that the trial court erroneously admitted portions of his confession because there had been no hearing outside the presence of the jury to determine the voluntariness of the confession. Relying on *Harris*, the State claimed that the confession was properly admitted as rebuttal evidence to impeach the defendant. The *Osbey* court agreed with the State, concluding that the statements were properly admitted as rebuttal evidence even though they were not admissible in the State's case-in-chief. 213 Kan. at 574. See also *State v. Andrews*, 218 Kan. 156, 159, 542 P.2d 325 (1975) (same issue).

The facts in *State v. Boone*, 220 Kan. 758, 768-69, 556 P.2d 864 (1976), are similar to those in *Hass*. Boone requested to speak with an attorney after he was arrested and the officers had given him *Miranda* warnings. However, before Boone had an opportunity to talk to an attorney, the officers obtained a statement from Boone regarding his whereabouts prior to his arrest. At trial, Boone testified differently about his whereabouts before his arrest, and the State offered the officer's testimony to impeach him. The *Boone* Court relied on *Harris* and *Hass* in concluding that the evidence was properly admitted to impeach Boone, even though it was inadmissible in the State's case-in-chief. *Boone*, 220 Kan. at 768-69. See also *State v. Graham*, 244 Kan. 194, 203-04, 768 P.2d 259 (1989) (allowing statements made without *Miranda* warnings to be used to impeach the defendant's testimony); *State v. Greene*, 214 Kan. 78, 82, 519 P.2d 651 (1974) (admitting statements made with improper *Miranda* warnings to be used for impeachment); *State v. Robinson*, 4 Kan. App. 2d 428, 433, 608 P.2d 1014 (1980) (assuming that the defendant did not properly and effectively waive his *Miranda* rights but allowing the State to use the statements to impeach the defendant); *State v. Stoops*, 4 Kan. App. 2d 130, 134-35, 603 P.2d 221 (1979) (affirming the admission of statements made to police after the defendant invoked his right to counsel to impeach the defendant). *Cf. State v. Roberts*, 223 Kan. 49, 57-58,

574 P.2d 164 (1977) (distinguishing *Harris* and *Hass* and precluding the admission of involuntary statements to impeach the defendant).

In keeping with its decisions in *Harris* and *Hass*, the United States Supreme Court extended the Fifth Amendment analysis to a Sixth Amendment issue in *Michigan v. Harvey*, 494 U.S. 344, 350-51, 108 L. Ed. 2d 293, 110 S. Ct. 1176 (1990). Two months after Harvey had been arraigned on two counts of rape, he told a police officer that he would like to make another statement but did not know if he should talk to his attorney. The officer told Harvey that he did not need to speak with his attorney because his attorney would get a copy of the statement anyway. After signing portions of a constitutional rights waiver indicating that he understood his right to remain silent and have an attorney present during the questioning, Harvey made statements that were inconsistent with his later trial testimony. The State conceded that Harvey's statements were not admissible during its case-in-chief, but argued that under *Harris*, the statements were admissible to impeach Harvey. 494 U.S. at 346-47.

In another five-to-four decision, the *Harvey* Court agreed with the State but remanded the matter for factfinding to determine whether Harvey had knowingly and voluntarily waived his Sixth Amendment right to counsel. 494 U.S. at 354. The *Harvey* Court noted the prophylactic rule from *Michigan v. Jackson*, 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986), which requires the exclusion of any statements made to police after the Sixth Amendment right to counsel has attached if the police initiated the conversation. Reasoning that the *Jackson* prophylactic rule was analogous to the *Miranda* prophylactic rule, the *Harvey* Court extended its holding in *Harris* to apply to Sixth Amendment violations. 494 U.S. at 349, 351. The *Harvey* Court stated that the " 'search for the truth in a criminal case' outweighs the 'speculative possibility' that exclusion of evidence might deter future violations of rules not compelled directly by the Constitution in the first place," 494 U.S. at 351-52.

The dissenting justices in *Harvey* refused to reduce the Sixth Amendment right to counsel to the status of a prophylactic rule, stating:

"The exclusion of statements made by a represented and indicted defendant outside the presence of counsel follows not as a remedy for a violation that has preceded trial but as a necessary incident of the constitutional right itself. '[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial.' *Strickland v. Washington*, 466 U.S. 668, 684, [80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)]. It is not implicated, as a general matter, in the absence of some effect of the challenged conduct on the trial process itself. [Citations omitted.] It is thus the use of the evidence for trial, not the method of its collection prior to trial, that is the gravamen of the Sixth Amendment claim." 494 U.S. at 362-63.

In this case, the State's reliance on *Harris* and its progeny does not reconcile the factual distinction between those cases and this case. In *Harris*, *Hass*, and *Harvey*, the defendant dealt directly with law enforcement officers. In contrast, the statements at issue in this case were made to a jailhouse informant who was surreptitiously acting as an agent of the State. We believe this factual distinction is significant.

The United States Supreme Court addressed the impact of jailhouse informants on the Sixth Amendment right to counsel in *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980). In *Henry*, government agents sought assistance from an jailhouse informant who had provided confidential information to the government for over a year. The government agents asked the jailhouse informant to be "alert to any statements" made by Henry and other federal prisoners. 447 U.S. at 266. Henry confided in the jailhouse informant about his involvement in a bank robbery and sought the informant's assistance in breaking out of jail. The jailhouse informant testified against Henry at his trial.

The *Henry* Court held that the admission of the jailhouse informant's testimony violated Henry's Sixth Amendment right to counsel. 447 U.S. at 274. The *Henry* Court relied on *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964), which held that the government cannot use a defendant's incriminating statements when the statements are obtained by a surreptitious informant working as an agent for the government. Noting that the "concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Gov-

ernment," the *Henry* Court concluded that Henry's statements "should not have been admitted *at trial.*" (Emphasis added.) 447 U.S. at 273-74. The *Henry* Court distinguished between Fourth and Fifth Amendment cases, stating that "those cases are not relevant to the inquiry under the Sixth Amendment here—whether the Government has interfered with the right to counsel of the accused by 'deliberately eliciting' incriminating statements." 447 U.S. at 272. Unlike the Court's analysis in *Harris, Hass,* and *Harvey,* the *Henry* Court did not consider whether the government violated a prophylactic rule or a constitutional right.

Neither this court nor the United States Supreme Court has previously addressed the issue presented by the facts of this case. Although the *Harvey* Court addressed a related issue, it specifically left open the question presented by the facts in this case, stating, "we need not consider the admissibility for impeachment purposes of a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel." 494 U.S. at 354. However, a few other jurisdictions have squarely addressed the issue.

In *United States v. McManaman,* 606 F.2d 919 (10th Cir. 1979), the Tenth Circuit allowed the admission of statements the defendant made to an undercover informant for the purpose of impeaching the defendant's testimony. Deciding the issue without the benefit of the *Henry* decision, the *McManaman* court refused to extend the *Massiah* rule, which precludes the admission of evidence obtained by an undercover informant while the defendant is represented by counsel. Instead, the *McManaman* court relied on the reasoning in *Walder,* stating that a defendant is not free to make a sweeping denial of the charges by "possibly perjurious testimony, in reliance on the Government's inability to challenge his credibility because its rebuttal evidence was illegally secured." 606 F.2d at 925.

Likewise, in *United States v. Langer,* 41 M.J. 780 (A.F. Ct. Crim. App. 1995), the United States Air Force Court of Criminal Appeals allowed the admission of the defendant's statements to an undercover informant to impeach the defendant's testimony. Relying on *Harvey,* the *Langer* court stated:

"We see no significant distinction between a Sixth Amendment violation committed in a station house, by police officers who have identified themselves to a suspect, and a covert one committed by an undercover agent. In each instance, society demands that the prosecution pay a price so that future violations may be deterred. That price is exclusion of the tainted evidence from the prosecution case-in-chief. However, society should not be made to suffer a Sixth Amendment violation as a license for an accused to commit perjury without fear of contradiction. Such a cost is too high." 41 M.J. at 784.

In *United States v. Martin*, 974 F. Supp. 677 (C.D. Ill. 1997), a federal district court in Illinois ruled that the Government could use the defendant's statements to an undercover agent to impeach the defendant's testimony. The *Martin* court concluded that the defendant's statements to the undercover agent were voluntary but that he had not made a knowing and voluntary waiver of his right to counsel. Nevertheless, the *Martin* court reasoned that barring the defendant's statements "would diminish the Court's truth-seeking purpose in a criminal trial and would give too little weight to antiperjury considerations." 974 F. Supp. at 684.

In contrast, the Supreme Court of Maine held that the State could not use surreptitiously recorded statements obtained in violation of the defendant's right to counsel to impeach the defendant's testimony. *State of Maine v. York*, 705 A.2d 692 (Me. 1997). Concluding that offering the evidence amounted to a constitutional violation rather than the violation of a prophylactic rule because the defendant did not waive his right to counsel, the *York* court distinguished *Harvey* and refused to admit the evidence for any purpose. 705 A.2d at 695.

From these cases, we have discerned two analytical approaches for resolving the issue. The first approach focuses on the court's truth-seeking function by denying the defendant an opportunity to commit perjury without contradiction. This approach ignores *Henry* and the requirement that defendants make a knowing and voluntary waiver of their Sixth Amendment right to counsel. The second approach requires a knowing and voluntary waiver of the Sixth Amendment right to counsel. The knowing and voluntary waiver is not dependent upon whether the defendant will have an opportunity to commit perjury.

The Court of Appeals followed the first approach, focusing on the court's truth-seeking function and preventing perjury. While this approach is supported by *McManaman, Langer,* and *Martin,* it fails to harmonize the United States Supreme Court's decisions in *Henry* and *Harvey.* The *Harvey* Court refused to address the admission of statements made without a knowing and voluntary waiver of the Sixth Amendment right to counsel. The *Henry* Court concluded that a defendant cannot knowingly and voluntarily waive his Sixth Amendment rights if he or she is dealing with an undercover informant. Considering *Harvey* in conjunction with *Henry* leads us to conclude that the second approach applied by the *York* court is more constitutionally sound.

A criminal prosecution commences when a complaint is filed and a warrant issued. The defendant's Sixth Amendment right to counsel attaches at that point. *State v. McCorgary* 218 Kan. 358, 361, 543 P.2d 952 (1975) *cert. denied* 429 U.S. 867 (1976). Once a criminal prosecution has commenced, the defendant's statements made to an undercover informant surreptitiously acting as an agent for the State are not admissible at trial for any reason, including the impeachment of the defendant's testimony. *Cf. State v. Pennington* 276 Kan. 841, 846, 80 P.3d 44 (2003) (allowing statements from an undercover jailhouse informant acting as an agent for the State because the defendant had not been charged with the crime at issue). Although trial judges are called upon to determine the admissibility of evidence to effectuate the courts' truth-seeking function, there is nothing in our federal or state constitutions that requires us to make truth-seeking the overriding principle that trumps our constitutionally protected rights. By following the first approach, the Court of Appeals primarily focused on admissibility of rebuttal evidence rather than the impact of such a glaring violation of a constitutional right.

Without a knowing and voluntary waiver of the right to counsel, the admission of the defendant's uncounseled statements to an undercover informant who is secretly acting as a State agent violates the defendant's Sixth Amendment rights. We disagree with the conclusion that the admission of such statements merely violates a prophylactic rule. Unlike *Harris,* the State did not simply

fail to give Ventris *Miranda* warnings, and, unlike *Harvey*, the State did not merely interrogate Ventris after his right to counsel had attached. Rather, the State purposely circumvented the requirement for a knowing and voluntary waiver of Ventris' right to counsel when it recruited Doser to surreptitiously obtain statements from Ventris in his jail cell. Allowing the admission of this testimony as rebuttal evidence would invite the State to engage in clandestine behavior in gathering evidence in violation of our constitutional rights. The purity of justice under our Sixth Amendment's constitutional right to counsel cannot be polluted by the subversive conduct of deceitful acquisition of evidence.

The State seeks to limit our analysis to whether Ventris' statements to Doser were voluntary. However, the State's argument misstates the applicable test for Sixth Amendment violations. Voluntariness of the statement is a test for Fifth Amendment violations. See *Hass*, 420 U.S. at 722. The test for Sixth Amendment violations is whether the defendant knowingly and voluntarily waived the right to counsel. See *Harvey*, 494 U.S. at 354. Waiver is valid only when it reflects " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Patterson v. Illinois*, 487 U.S. 285, 292, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed 1461, 58 S. Ct. 1019 [1938]). In this case, there are no facts to support a finding that Ventris knowingly and voluntarily waived his right to counsel even though his statements to Doser may have been voluntary.

In reaching our conclusion that the district court erroneously admitted testimony from a jailhouse informant in this case, we find it necessary to emphasize the fact that the jailhouse informant in this case was recruited to be an agent for the State. The fact that the State initiated the contact with the jailhouse informant and arranged to secretly monitor the defendant's statements distinguishes this case from a case where the jailhouse informant approaches the State with information and offers to testify against the defendant. We find the State's conduct to be particularly egregious in this case, particularly because the State knew that its actions violated Ventris' Sixth Amendment rights. Nevertheless, we do not intend for the rule in this case to deter testimony from all

informants. Rather, the rule is meant to prohibit the State from recruiting undercover informants to obtain statements once a prosecution has commenced without a knowing and voluntary waiver of the defendant's Sixth Amendment right to counsel. This rule does not apply when informants approach the State with relevant information that is otherwise admissible.

Ventris properly argues that the district court erroneously admitted testimony from a jailhouse informant who had been surreptitiously placed in Ventris' jail cell to obtain incriminating evidence. The admission of the evidence violated Ventris' Sixth Amendment right to counsel. However, an error of constitutional magnitude does not require reversal if it is harmless. The erroneous admission of evidence in violation of a constitutional right is governed by the federal constitutional error rule, which provides that an error is harmless only if the reviewing court is able to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the outcome of the trial. *State v. Hebert*, 277 Kan. 61, 96, 82 P.3d 470 (2004).

The jailhouse informant's testimony directly contradicted Ventris' version of events. The jury had to decide whether to believe Theel's story that Ventris masterminded the robbery or Ventris' story that Theel orchestrated the events in which he was not a willing participant. The jailhouse informant's testimony was admitted solely to impeach Ventris' credibility. Although the verdict indicates that the jury did not fully believe Theel, we cannot conclude beyond a reasonable doubt that the admission of the jailhouse informant's testimony would not have changed the result of the trial. Without the jailhouse informant's testimony, the jury might have considered Ventris' story more believable and acquitted him on all of the counts. Accordingly, we must find that the error was not harmless and Ventris' convictions must be reversed.

Although the first issue is dispositive of Ventris' convictions, we must address the second issue because it may arise again at Ventris' next trial. Ventris argues that the district court erroneously admitted Theel's testimony that Ventris had forcibly strip-searched Theel approximately 1 month before Hicks was killed. Ventris argues that the evidence was admitted in violation of K.S.A. 60-455 without a

motion or a limiting instruction. According to Ventris, the evidence was highly prejudicial because it implied that Ventris was a dominating partner. The State argues that the evidence was properly admitted as res gestae to explain the relationship between Theel and Ventris.

The Court of Appeals concluded that the district court abused its discretion by admitting the evidence but determined that the error was harmless. *Ventris*, slip op. at 16. When analyzing a district court's decision to admit evidence, an appellate court first considers whether the evidence is relevant. Once relevance is established, the court applies the evidentiary rules either as a matter of law or in the exercise of the district court's discretion, depending on the contours of the rule in question. *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). Once relevance has been established, an appellate court reviews the admission of evidence pursuant to K.S.A. 60-455 as a question of law, subject to de novo review. 282 Kan. at 47-48.

Ventris first claims that the evidence could not be admitted because the State failed to file a motion seeking the admission of the evidence. Ventris cites no authority for this claim. Without any supporting argument or authority, we decline to address this argument. See *State v. Baker*, 281 Kan. 997, 1015, 135 P.3d 1098 (2006).

Next, Ventris asserts that the evidence violated K.S.A. 60-455, which provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Pursuant to K.S.A. 60-455, evidence of other crimes and civil wrongs is not admissible if it is not relevant to a disputed material fact. Relevance is established by some material and logical connection between the asserted fact and inference or result it is intended to establish. *Gunby*, 282 Kan. at 47.

The district court admitted the evidence independently of K.S.A. 60-455, relying on the concept of res gestae. However, we put an end to the practice of admitting evidence of other crimes or civil wrongs independently of K.S.A. 60-455 in *Gunby*. 282 Kan. at 57. We also rejected res gestae as a legal basis for admitting evidence, stating:

"This case provides an opportunity to end this particular confusion of thought, and we hereby do so. The concept of res gestae is dead as an independent basis for admissibility of evidence in Kansas. That evidence may be part of the res gestae of a crime demonstrates relevance. But that relevance must still be measured against any applicable exclusionary rules. *Gunby*, 282 Kan. at 63.

The Court of Appeals concluded that the trial court committed error. However, the Court of Appeals concluded that the error was harmless. We decline to make that determination at this point. We have already concluded that Ventris is entitled to a new trial on other grounds. If the State seeks admission of this evidence at Ventris' new trial, the district court must address the test for admitting evidence of other crimes or civil wrongs. Specifically, the district court must determine whether the evidence is relevant to any disputed material fact. If so, the court must then determine whether the evidence is more probative than prejudicial. If the district court concludes that the evidence survives these hurdles, it must give the jury a limiting instruction. See *Gunby*, 282 Kan. at 56-57.

Because we have reversed Ventris' convictions and vacated his sentences, we do not need to address his claim that his sentences are unconstitutional because they are dependent on the determination of his criminal history which was not proven beyond a reasonable doubt to a jury.

DAVIS and JOHNSON, JJ., not participating.

McANANY, J., and LARSON, S.J., assigned.

McFARLAND, C.J., dissenting: I respectfully dissent from the majority's decision holding that, once a criminal prosecution has commenced, statements made to an undercover informant surreptitiously acting as an agent for the State are not admissible at trial for any reason, including impeachment of the defendant's testimony.

Although the United States Supreme Court has not addressed this precise issue, it has repeatedly and consistently allowed the admission of evidence and statements otherwise inadmissible in the prosecution's case in chief to be used for purposes of impeachment, except where such evidence was obtained by coercion or was otherwise involuntary. The Court determined in those cases that, when the issue is the use of such evidence for impeachment purposes, the deterrence policy supporting exclusion is outweighed by the importance of impeachment to the proper functioning of the truth-finding process.

Moreover, of the jurisdictions that have considered this very issue, all but one have applied the Supreme Court's balancing analysis to hold that uncounseled incriminating statements deliberately elicited from an accused through a secret informant in violation of the Sixth Amendment right to counsel may, nevertheless, be used to impeach a defendant's contradictory trial testimony.

The majority rejects the analysis employed in those cases, choosing instead to adopt a per se rule of exclusion that expands exclusion jurisprudence beyond the limits of that ever recognized by the Supreme Court. I believe the majority's rationale supporting its conclusion is faulty in several respects. First, the majority errs in justifying a per se rule of inadmissibility by finding constitutional significance in the surreptitious nature of the police conduct in this case. It is the deliberate elicitation of uncounseled statements, whether directly by law enforcement officers or secretly through the use of undercover informants, not the surreptitious nature of the government's conduct, that is the gravamen of a Sixth Amendment violation under *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964), and *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980). Second, the majority misapprehends the role of waiver in the analysis of

the limited question of whether statements obtained in violation of *Massiah/Henry* should be admissible only for impeachment. Third, the majority ignores the significance of the voluntary nature of the defendant's statements in determining the admissibility of those statements for impeachment purposes.

### The significance of the surreptitious nature of the police conduct.

The surreptitious nature of the police conduct in this case is the overriding theme upon which the majority justifies the result. Specifically, the majority determines that the balancing analysis employed in the *Harris* (*Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 [1971]) line of cases does not apply because the defendants in those cases were dealing directly with law enforcement officers, while in this case the defendant was dealing with an undercover informant who obtained his statements surreptitiously. Moreover, the majority characterizes the conduct in this case as "particularly egregious" due to its surreptitious nature. The majority states:

"Unlike *Harris*, the State did not simply fail to give Ventris *Miranda* warnings, and, unlike *Harvey*, the State did not merely interrogate Ventris after his right to counsel had attached. Rather, the State purposely circumvented the requirements for a knowing and voluntary waiver of Ventris' right to counsel when it recruited Doser to surreptitiously obtain statements from Ventris in his jail cell. Allowing the admission of this testimony as rebuttal evidence would invite the State to engage in clandestine behavior in gathering evidence in violation of our constitutional rights. The purity of justice under our Sixth Amendment's constitutional right to counsel cannot be polluted by the subversive conduct of deceitful acquisition of evidence." 285 Kan. at 606-07.

I am concerned that the majority has erred in finding constitutional significance in the fact that police elicited statements through "surreptitious," "clandestine," and "deceitful" means. The United States Supreme Court has specifically rejected the notion that the surreptitious nature of the police conduct in eliciting uncounseled statements has any constitutional significance. See *Brewer v. Williams*, 430 U.S. 387, 400, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977) ("That the incriminating statements were elicited sur-

reptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant.").

Although *Massiah* and *Henry* involved secret informants, the Sixth Amendment violations in those cases did not hinge on the surreptitious nature of the government's conduct. Rather, it was the government's use of secret informants to *deliberately elicit* incriminating statements from the accused—conduct that is "the functional equivalent of interrogation." *United States v. Henry*, 447 U.S. at 277 (Powell, J., concurring). Explaining his understanding of the majority's holding in *Henry*, Justice Powell stated:

"[T]he Sixth Amendment is not violated when a passive listening device collects, but does not induce, incriminating comments. [Citation omitted.] Similarly, the mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional. In such a case, the question would be whether the informant's actions constituted deliberate and 'surreptitious interrogatio[n]' of the defendant. If they did not, then there would be no interference with the relationship between client and counsel.

". . . I could not join the Court's opinion if it held that the mere presence or incidental conversation of an informant [placed] in a jail cell would violate *Massiah*. To demonstrate an infringement of the Sixth Amendment, a defendant must show that the government engaged in conduct that, considering all of the circumstances, is the functional equivalent of interrogation. [Citations omitted.]

"Because I understand that the decision today rests on a conclusion that this informant deliberately elicited incriminating information by such conduct, I join the opinion of the Court." 447 U.S. at 276-77 (Powell, J., concurring).

In *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 91 L. Ed. 2d 364, 106 S. Ct. 2616 (1986), the Court had opportunity to address the "passive listener" situation anticipated by Justice Powell. Wilson was arrested for his role in a robbery of a taxi garage in which the night dispatcher was killed. Upon being arrested, Wilson told the police that although he was present when the crimes occurred he was only a witness. After arraignment, Wilson was purposefully placed in a jail cell with an individual who, unbeknownst to Wilson, had made an agreement with the police to listen for statements made by Wilson and report his remarks to police. The informant was instructed not to ask Wilson any questions.

Wilson first told the informant the same exculpatory version of events that he had given police at the time of his arrest. The informant responded that his story "didn't sound too good." 477 U.S. at 439-40. Later, Wilson changed his story and told the informant that he and two other men had planned and carried out the robbery and had murdered the dispatcher.

At the suppression hearing, the trial court held the statements were admissible. The trial court found that the police had instructed the informant to not ask questions about the crime but to only listen for comments Wilson might make in his presence, and that the informant had followed those instructions. The trial court found that Wilson's statements were spontaneous and unsolicited and that the informant " 'at no time asked any questions with respect to the crime,' and that he 'only listened to [Wilson] and made notes regarding what [Wilson] had to say.' " 477 U.S. at 440.

The Supreme Court found no Sixth Amendment violation. The Court held that the Sixth Amendment is not violated where an accused makes statements to a jailhouse informant who was placed in close proximity with the accused but who did not take specific action designed to deliberately elicit incriminating statements. 477 U.S. at 459.

In reaching its decision, the *Kuhlmann* Court examined the *Massiah* line of cases, and concluded that the primary concern in those cases was the government's use of techniques that are the equivalent of direct police interrogation:

"[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever-by luck or happenstance-the State obtains incriminating statements from the accused after the right to counsel has attached,' 474 U.S., at 176, citing *United States v. Henry*, supra, at 276, (Powell, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459.

After *Kuhlmann*, it is clear that the surreptitious nature of the police conduct in a *Massiah/Henry* violation is not the gravamen

of the Sixth Amendment violation. The Sixth Amendment is not implicated where the police surreptitiously obtain incriminating statements from an accused by placing a secret informant in an accused's cell for the purpose of obtaining incriminating statements, as long as the informant does not do what the police cannot do directly—deliberately elicit incriminating remarks. Thus, there is no constitutional significance in the fact that the police dealt with Ventris through a secret informant and surreptitiously elicited incriminating statements from him.

The Air Force Court of Criminal Appeals recognized this point in *United States v. Langer*, 41 M.J. 780 (A.F. Ct. Crim. App. 1995). In holding that statements obtained through a *Massiah* violation may be used for impeachment purposes, the court expressly rejected the notion that the fact that the police elicited the statements indirectly through surreptitious means rather than directly and at the station house has any constitutional relevance in determining the admissibility of those statements for impeachment purposes:

"Once formal criminal proceedings begin, police may not deliberately elicit statements from an accused without an express waiver of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977); *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964); Mil.R.Evid. 305(d)(1)(B). This is true whether the questioning is in a custodial setting and done by persons known by the accused to be police (*Williams*), or surreptitiously by an undercover agent (*Maine v. Moulton*, 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985); *Massiah*). . . .

". . . We see no significant distinction between a Sixth Amendment violation committed in a station house, by police officers who have identified themselves to a suspect, and a covert one committed by an undercover agent." *Langer*, 41 M.J. at 783-84.

"[T]he soundest of reasons is necessary to warrant the exclusion of evidence otherwise admissible and the creation of another area of privileged testimony. . . . [A]dditional barriers to the pursuit of truth [should be erected on] solid foundations which decisions of this gravity . . . require." *Massiah*, 377 U.S. at 208 (White, J., dissenting). Because the majority's rationale rests on the unsound characterization of the surreptitious police conduct as an egregious constitutional violation, I dissent.

Before moving on, I must note that the State conceded that it violated the Sixth Amendment. In conceding this point in its brief, the State cites *State v. McCorgary*, 218 Kan. 358, 361-363, 543 P.2d 952 (1975) *cert. denied* 429 U.S. 867 (1976). In *McCorgary*, this court held that, because the surreptitious arrangement is the evil at issue, deliberate elicitation is not required to establish a *Massiah* violation. 218 Kan. at 362. *McCorgary*, however, predates *Kuhlmann* and, thus, it is no longer a correct statement of the law. The State's brief does not cite *Kuhlmann* but, in light of that case, I believe there is a legitimate issue as to whether the State's conduct in this case violated the Sixth Amendment. Under *Kuhlmann*, merely placing Doser in Ventris' cell for the purpose of listening for incriminating statements did not violate Ventris' constitutional right to counsel. Ventris' Sixth Amendment right to counsel was violated only if the State, through Doser, "took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459. From the record on appeal, it does not appear that Doser crossed that line.

Doser was approached by Steve Fryback (it appears, but is not clear, that Fryback is a law enforcement officer) and was asked if he would be willing to be placed in Ventris' cell to listen for and report what he might say. Doser testified that he was specifically told "[j]ust to keep [his] ear open and listen . . . to what he had to say."

The first day Doser was in the cell with Ventris, he was not very talkative. On the second day, Doser told Ventris that he could tell by the look in his eyes that he had something more serious weighing on his mind. Ventris than asked Doser if he could trust him. Doser told Ventris that he could. Ventris asked Doser if what he said would stay in the room between them, and Doser said it would. Ventris then showed Doser a piece of paper which showed he had been arrested as a suspect in a murder. Ventris told Doser he would show him his hand in a little bit. After that, Ventris told Doser that he and his girlfriend Rhonda had gone to rob somebody, but it went sour. He said he shot a man in his head and chest, and that he took his keys, his wallet, $350, and a vehicle.

Doser testified that he did not push Ventris for any information and he did not ask him any details. According to Doser, Ventris volunteered information and he simply let Ventris do the talking.

The informant's conduct in this case is not significantly different from the conduct that was held to not be a violation of the Sixth Amendment in *Kuhlmann*. Applying *Kuhlmann*, it would appear at least arguable that Ventris' statements were not obtained in violation of the Sixth Amendment and, thus, they were admissible for all purposes. This issue should not have been conceded. Prosecutors should be mindful that they represent a party to the litigation—the people of the state of Kansas—and are bound by the ethical duty to provide zealous advocacy on behalf of their client. That duty encompasses the obligation to litigate viable dispositive issues with "earnestness and vigor." *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935) (while a prosecutor is not at liberty to strike foul blows, he may strike hard ones, and "[h]e may prosecute with earnestness and vigor—indeed, he should do so.").

**The role of waiver in the analysis of whether statements obtained in violation of *Massiah/Henry* should be admissible only for impeachment.**

The majority states that there are two analytical approaches for resolving the issue of whether inculpatory statements obtained as the result of a *Massiah/Henry* violation of the Sixth Amendment right to counsel should be admissible for impeachment. One approach focuses on the importance to the truth seeking function of the adversary process that defendants not be permitted the opportunity to commit perjury without fear of contradiction. That approach, according to the majority, "ignores *Henry* and the requirement that defendants make a knowing and voluntary waiver of their Sixth Amendment right to counsel." 285 Kan. at 605. The other approach, the majority states, requires a knowing and voluntary waiver and is not dependant on preventing the opportunity for perjury. The majority concludes the waiver approach is the more constitutionally sound and, based thereon, holds that "[w]ithout a knowing and voluntary waiver of the right to counsel,

the admission of the defendant's uncounseled statements to an undercover informant who is secretly acting as a State agent violates the defendant's Sixth Amendment rights." 285 Kan. at 606.

The existence of waiver of the right to counsel is a relevant factor in determining whether statements elicited outside of the presence of counsel were obtained in violation of the Sixth Amendment and are therefore inadmissible in the prosecution's case in chief. See *Johnson v. Zerbst*, 304 U.S. 458, 463-64, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938). In a *Massiah/Henry* violation, waiver of the right to counsel or, more accurately, the lack thereof, is relevant to the determination that the use of an undercover informant to deliberately elicit uncounseled incriminating statements violated the Sixth Amendment and, consequently, in holding that such statements are inadmissible in the prosecution's case in chief. Specifically, the use of an undercover informant to elicit uncounseled incriminating statements violates the Sixth Amendment because there cannot be a waiver of the right to counsel under those circumstances:

"[T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. [Citation omitted.] In that setting, Henry, being unaware that Nichols was a Government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel." 447 U.S. at 273.

The absence of waiver of the right to counsel inherent in the undercover informant situation is *the* pertinent factor underlying the conclusion that surreptitiously eliciting uncounseled incriminating statements violates the Sixth Amendment and the statements are, therefore, inadmissible in the case in chief. In this case, however, we are beyond determining whether there was a Sixth Amendment violation in the first instance. With waiver being the basis for the determination that statements obtained in violation of *Massiah/Henry* are inadmissible in the prosecution's case in chief, using the absence of waiver again to determine whether those statements should also be inadmissible for impeachment purposes begs the question, as "the answer in the first context necessarily predetermines the answer in the second context." *State v. Hoeck,*

284 Kan. 441, 461, 163 P.2d 252 (2007) (holding that the "substantial basis" test cannot be used to determine both the validity of the warrant and the applicability of the good faith exception to the exclusionary rule because "the answer in the first context necessarily predetermines the answer in the second context"). Accordingly, waiver, or the lack thereof, is simply not relevant to determining the admissibility of surreptitiously elicited statements for impeachment purposes.

The fact that there was a waiver in *Michigan v. Harvey*, 494 U.S. 344, 108 L. Ed. 2d 293, 110 S. Ct. 1176 (1990), does not mean waiver is relevant in determining the admissibility of the defendant's statements for impeachment under the circumstances of this case. In *Harvey*, the defendant gave a written waiver of the right to counsel. Of course, as discussed above, there is no waiver in a *Massiah* violation. The Supreme Court recognized this distinction in *Harvey* by noting that it was not addressing "the admissibility for impeachment purposes of a voluntary statement obtained in the *absence of a knowing and voluntary waiver of the right to counsel.*" (Emphasis added.) 494 U.S. at 354.

### The relevance of the voluntary nature of the statements in determining whether statements obtained in violation of *Massiah/Henry* should be admissible only for impeachment.

In an analysis fatally linked to the erroneous determination that waiver is relevant to the issue of admissibility for impeachment purposes, the majority holds that the voluntary nature of Ventris' statements are irrelevant to the issue of admissibility for impeachment:

"The State seeks to limit our analysis to whether Ventris' statements to Doser were voluntary. However, the State's argument misstates the applicable test for Sixth Amendment violations. Voluntariness of the statement is a test for Fifth Amendment violations. See *Hass*, 420 U.S. at 722. The test for Sixth Amendment violations is whether the defendant knowingly and voluntarily waived the right to counsel. See *Harvey*, 494 U.S. at 354. Waiver is valid only when it reflects ' "an intentional relinquishment or abandonment of a known right or privilege." ' *Patterson v. Illinois*, 487 U.S. 285, 292, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019 [1938]). In this case, there are no facts to support a finding that Ventris knowingly

and voluntarily waived his right to counsel *even though his statements to Doser may have been voluntary.*" (Emphasis added.) 285 Kan. at 606.

First, as discussed above, for the issue at hand, we are *beyond* determining whether a Sixth Amendment violation occurred. The relevance of the absence of waiver of the right to counsel inherent in a *Massiah/Henry* violation has been exhausted and is of no further relevance once the issue becomes admissibility for impeachment purposes.

Second, the majority errs in holding that voluntariness is irrelevant to the issue of whether the statements are admissible for impeachment purposes. In fact, in refusing to address the very issue at hand, the Supreme Court in *Harvey* implicitly recognized that even in a situation where there is no waiver of the right to counsel, voluntariness is still relevant to the issue of admissibility for impeachment when it said, "we need not consider the admissibility for impeachment purposes of a *voluntary statement* obtained in the absence of a knowing and voluntary waiver of the right to counsel." (Emphasis added.) *Harvey*, 494 U.S. at 354.

Moreover, in *Harris*, the Court explained that adopting a per se rule of exclusion that fails to take into account the voluntariness of the statements at issue would be "an extravagant extension of the Constitution":

"If, for example, an accused confessed fully to a homicide and led the police to the body of the victim under circumstances making his confession inadmissible, the petitioner would have us allow that accused to take the stand and blandly deny every fact disclosed to the police or discovered as a 'fruit' of his confession, free from confrontation with his prior statements and acts. The voluntariness of the confession would, on this thesis, be totally irrelevant. We reject such an extravagant extension of the Constitution." *Harris*, 401 U.S. at 225 n.2.

See also *State v. Boone*, 220 Kan. 758, 768, 556 P.2d 864 (1976) (noting, under *Harris* and *Hass*, statements inadmissible in case in chief may be used for impeachment where there is no evidence that the statements at issue were coerced or involuntary).

The bottom line is that "the exclusion of reliable and probative evidence for *all* purposes" is required only when it is the product of coercion. *Harvey*, 494 U.S. at 351 (citing *New Jersey v. Portash*, 440 U.S. 450, 59 L. Ed. 2d 501, 99 S. Ct. 1292 [1979] [compelled

incriminating statements inadmissible for impeachment purposes]; *Mincey v. Arizona*, 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 [1978] [same]); *State v. Mattatall*, 603 A.2d 1098, 1114 (R.I. 1992) (in holding that surreptitiously elicited statements obtained in violation of the Sixth Amendment under *Henry* may be used for impeachment, court noted that "[t]he exclusion of reliable and probative evidence for all purposes is not mandated unless it is derived from coerced or involuntary statements"). Thus, voluntariness is the *key inquiry* in determining the admissibility of statements obtained in violation of *Massiah/Henry* for purposes of impeachment. *United States v. Martin*, 974 F. Supp. 677, 679-80(C.D. Ill. 1997) (voluntariness is the key inquiry in determining whether secretly recorded incriminating statements obtained in violation of *Massiah* may be used for impeachment).

In this case, there is nothing in the record that would indicate that Ventris' statements to the undercover informant were coerced or were otherwise involuntarily made. Moreover, the district court found that Ventris' statements to Doser were voluntarily made, and the majority does not hold otherwise.

### The balancing analysis.

Although the Supreme Court has not addressed the question of whether statements inadmissible as a product of a *Massiah/Henry* violation may be used for impeachment, in other situations it has consistently allowed illegally obtained evidence and statements of the accused to be admitted for impeachment purposes. See *Walder v. United States*, 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354 (1954) (allowing physical evidence that is inadmissible in the prosecution's case in chief because it was obtained in violation of the Fourth Amendment to be used to impeach the defendant's testimony); *Harris v. New York*, 401 U.S. 222 (holding that otherwise inadmissible statements obtained from a suspect through custodial interrogation without giving *Miranda* warnings may be used for impeachment purposes); *Oregon v. Hass*, 420 U.S. 714, 722, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975) (allowing statements that are inadmissible in the prosecution's case in chief because they were obtained after a suspect invokes his or her right to counsel pursuant

to *Miranda* to be used to impeach the defendant's testimony); *United States v. Havens*, 446 U.S. 620, 627-28, 64 L. Ed. 2d 559, 100 S. Ct. 1912 (1980) (evidence illegally seized without a warrant admissible to impeach defendant's trial testimony); *Michigan v. Harvey*, 494 U.S. 344 (uncounseled statements elicited by police pursuant to an illegally obtained waiver of the right to counsel in violation of the Sixth Amendment may be used to impeach the defendant's testimony if the waiver can be shown to be valid).

The United States Supreme Court's decisions in the above cases rest on a careful balancing of two competing interests: the deterrence policy behind the exclusionary rule and the detrimental effect on the truth seeking process if constitutional violations can serve as a license to testify falsely free from the risk of confrontation with contradictory evidence.

The Court's analysis has emphasized "the importance of arriving at the truth in criminal trials, as well as the defendant's obligation to speak the truth in response to proper questions." *Havens*, 446 U.S. at 626. "If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak truthfully and accurately.' " *Harvey*, 494 U.S. at 351 (quoting *Harris*, 401 U.S. at 225). "It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *Havens*, 446 U.S. at 626-27. The Court has refused to "allow a defendant to 'turn the illegal method by which evidence in the government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " *Harvey*, 494 U.S. at 351 (quoting *Harris*, 401 U.S. at 224). A defendant should not be permitted to pervert the constitutional shield against having illegally obtained evidence used against him " 'into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' " *Havens*, 446 U.S. at 626 (quoting *Harris*, 401 U.S. at 226). "[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Walder*, 347 U.S. at 65.

The Supreme Court has consistently found that the importance of the impeachment process to the proper functioning of the adversary system outweighs the deterrence policy behind exclusion of illegally obtained evidence:

"The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Harris*, 401 U.S. at 225.

See also *Havens*, 446 U.S. at 627 ("The incremental furthering of [the policy behind exclusion] by forbidding impeachment of the defendant who testifies [is] deemed insufficient to permit or require that false testimony go unchallenged, with the resulting impairment of the integrity of the factfinding goals of the criminal trial.").

Although the Supreme Court has not addressed the question of whether statements inadmissible as a product of a *Massiah/Henry* violation may be used for impeachment, of the jurisdictions that have addressed this issue, all but one have applied the Supreme Court's balancing analysis and ruled that such statements may be used for impeachment. See *United States v. McManaman*, 606 F.2d 919 (10th Cir. 1979); *United States v. Martin*, 974 F. Supp. 677; *United States v. Langer*, 41 M.J. 780; *State v. Mattatall*, 603 A.2d 1098; *State v. Wilder*, 177 W.Va. 435, 352 S.E.2d 723 (1986); but see *State v. York*, 705 A.2d 692 (Me. 1997).

Illustrative of the rationale employed in those cases is the Rhode Island Supreme Court's opinion in *Mattatall*. In that case, the defendant's Sixth Amendment right to counsel was violated when a third party, in cooperation with police, allowed police to listen in on telephone conversations with the defendant during which he deliberately elicited incriminating statements from the defendant. In determining whether the defendant's statements were admissible for impeachment, the court applied the Supreme Court's balancing approach:

"The essence of a criminal trial is its search for the truth. In no way should the exclusionary rules enunciated by the Supreme Court in either *Weeks, Miranda, Jackson, Massiah, Henry,* or *Moulton* be perverted by any defendant into a license to commit perjury. The defendant's obligation to speak truthfully during the trial is absolute and is not lessened in response to violations of the defendant's constitutional rights. Such voluntary statements, although inadmissible in the state's case in chief, are properly accessible to the state for impeachment of a defendant's false or inconsistent testimony. Prior opinions of the Supreme Court, on the issue of impeachment, would indicate that the use of this evidence is not constitutionally prohibited." *Mattatall*, 603 A.2d at 1115.

The majority's decision in this case runs contrary to the weight of authority of other jurisdictions that have considered this issue, and in doing so, expands exclusion jurisprudence beyond the limits of that ever recognized by the Supreme Court. "There is no gainsaying that arriving at the truth is a fundamental goal of our legal system." *Havens*, 446 U.S. at 626. Today's decision seriously undermines the truth finding process of the adversary system by allowing criminal defendants to pervert the shield provided by the Sixth Amendment "to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances. *Hass*, 420 U.S. at 722. For these reasons, I dissent.